IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
_____

YELENA BIRD, ROBERT BUCKINGHAM,
FREEDOM CHETENI, JOHN MORAROS,
and SATYA RAO,

        Plaintiffs,

v.                                       No. CIV 08-851BB/LAM

REGENTS OF NEW MEXICO STATE
UNIVERSITY, LARRY OLSEN, in his
individual capacity, JAMES ROBINSON, in
his individual capacity, MICHAEL MARTIN,
in his individual capacity, and ROBERT
GALLAGHER, in his individual and official
capacities,

        Defendants.

## MEMORANDUM OPINION
## AND
## ORDER ON DEFENDANT OLSEN'S
## MOTION FOR SUMMARY JUDGMENT
## ON QUALIFIED IMMUNITY

       THIS MATTER is before the Court on the *Motion of Defendant Larry Olsen for Summary Judgment on the Basis of Qualified Immunity* [Doc. 20]. The Court having reviewed all submissions, finds the motion is not factually supported and it will be DENIED.

### *Legal Standard*

       "Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). When viewing the evidence, the Court must draw reasonable inferences in favor of the nonmoving party. *Utah Animal Rights Coalition v. Salt Lake County*, 566 F.3d 1236, 1242 (10th Cir. 2009). And since summary judgment is inappropriate if material facts are disputed, all material facts herein are stated from Plaintiffs' point of view. *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1175 (10th Cir. 2001).

Two other elements are at play when courts rule on summary judgment motions based on qualified immunity defenses. Indeed, when government officials raise the affirmative defense of qualified immunity, it will protect all "but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001). Thus, even if the Court accepts Plaintiffs' assertions as true, Plaintiffs still must show, first, that their alleged facts amount to a violation of a clearly-established statutory or constitutional right. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Second, Plaintiffs must show that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

To avoid summary judgment the nonmoving party may not rest upon the mere allegations in the pleadings but must show, at a minimum, an inference of the existence

of each essential element of the case. *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1016-17 (10th Cir. 2001) (citing *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)).  The opposing party must show that a witness has personal knowledge and must set forth facts that would be admissible in evidence.  *Salguero v. City of Clovis*, 366 F.3d 1168, 1177 n. 4 (10th Cir. 2004).  While the evidence need not be in a form that is admissible at trial, the content or substance of the evidence must be admissible.  *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1204 n. 1 (10th Cir. 2000).  Here, Plaintiffs submitted Declarations under oath rather than notarized "affidavits."  This is sufficient to meet the Rule 56 standard.  28 U.S.C. § 1746; *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992); *Haught v. The Louis Berkman, LLC*, 377 F. Supp. 2d 543, 551 (N.D.W. Va. 2005).

### *Background Facts*

Defendant Larry Olsen was first employed at New Mexico State University ("NMSU") in August 2001 as Professor of Health Science and Associate Dean. Plaintiffs, Yelena Bird and John Moraros, obtained undergraduate degrees from NMSU in 2002.  Dr. Olsen's relationship at NMSU with Bird and Moraros began in 2003 when they were enrolled in a graduate research course which Olsen taught.  In 2003, Moraros and Bird asked Olsen to serve as the chair of their respective theses for Master of Public Health degrees.  From 2004 through 2006, Olsen was either the academic advisor and/or supervisor for Bird and Moraros.  In Spring 2004, Olsen

nominated Moraros and Bird, as a team, to the NMSU Graduate School for consideration as outstanding Master's Students at NMSU.

In the early stages of their work relationship, Olsen and Moraros engaged in an exchange of humor, verbal and via email, and that sometimes included sexual humor. Beginning in late 2006 or early 2007, Olsen's jokes and emails became offensive. Olsen sent Bird many of the sexually explicit emails. (Bird Dec. ¶ 8). Moraros eventually confronted Olsen and told him his comments and emails were inappropriate and unwelcome. Olsen responded by threatening Moraros and stating that he would "bring you down." (Moraros Dec. ¶¶ 5-6).

Olsen's offensive comments began to include inappropriate and unwelcome racial content. For example, Olsen made comments to Moraros such as: "Minorities are unqualified to hold positions in the academy"; "the only good nigger is a dead nigger"; "few niggers and wetbacks have your kind of education"; and "there were very few 'jungle bunnies' with double doctorates in my day." (Moraros Dec. ¶ 5). Olsen told Bird, "Your people should know their place." (King Dec. ¶ 14; Bird Dec. ¶ 24). Olsen also made statements indicating that he would oppose the decision to make Moraros and Bird tenure-track faculty such as: "they never should have been hired in the first place" or words to that effect.

In the fall of 2007, Olsen angrily confronted two graduate students who were hand-carrying copies of Bird's and Moraros' dissertations to him. He stated that "I

4

have a lot of power in this College," that "you still need to get along with me and you need to graduate," and that "you don't want to be involved in this fucking mess." They took this to be a strong warning to stay away from Bird and Moraros and not to work with them. This placed Bird's and Moraros' ability to complete their Ph.D. research in jeopardy. (Banegas Dec. ¶ 8; Prapasiri Dec. ¶ 12).

In May 2007, Olsen cancelled two summer classes that were to be taught by Moraros. When Moraros attempted to reason with Olsen, the latter responded, "That's what happens to people with no sense of humor. I told you not to fuck with me." (Moraros Dec. ¶¶ 10, 11; Anderson Dec. ¶ 7). Olsen then told Moraros that both he and Bird needed Olsen in order to obtain their Ph.D. degrees and "if you do not play ball, I will make it impossible for you to get them ... then you can kiss your tenure line appointments with NMSU goodbye." (Moraros Dec. ¶ 11). In August 2007, Olsen unsuccessfully attempted to transfer $10,000 from Moraros and Bird's research grant account. However, as a result of this action, the grant account was frozen, which also temporarily jeopardized their ability to complete their research for their doctoral dissertations. (Moraros Dec. ¶ 9; King Dec. ¶ 10).

In the summer of 2007, James Robinson was appointed Chairman of the Health Sciences Department at NMSU. Olsen stated that Robinson was his friend and was coming in as the Chair of the Department of Health Sciences to "clean house, that many changes were going to be made and that heads were going to roll." Olsen then began

5

to collaborate with Robinson on how to eliminate Bird and Moraros.  (Anderson Dec. ¶ 8).

In late August 2007, Moraros and Bird made a complaint to Robinson regarding Olsen's offensive racial and sexual communications.  (Moraros Dec. ¶ 18).  Nonetheless, throughout the fall of 2007, Olsen continued exposing Moraros and other faculty members to sexually offensive emails and comments, sometimes with outrageous racial insults thrown in.  For example, Olsen made comments to Moraros (and others) comparing the vaginas of women of different races to different types of food.  On several occasions when talking to Moraros, Olsen made specific references to Bird saying: "How does it feel to knock boots and get it on with a nigger every night?  I hear they are hot and wild in bed.  Is that true?"  (Moraros Dec. ¶ 21; Buckingham Dec. ¶ 7). Moraros told Olsen that if Olsen did not stop his racially and sexually offensive communications and threats, Moraros would file a formal complaint with NMSU's Office of Institutional Equity.  Another faculty member, Robert Buckingham, advised Moraros not to do it as Olsen would likely retaliate.  (Buckingham Dec. ¶ 5).  Olsen then became belligerent and threatened the continued employment of Moraros and Bird.  (Buckingham *id.*; Moraros Dec. ¶ 23).

Olsen continued with his conduct and in December 2007, after opening a sexually offensive email from Olsen entitled "The Christmas Spirit," which also upset Bird who saw it, Moraros again approached Olsen to ask him to stop.  He responded that

Moraros' continued complaints would "end up costing both of you your Ph.D. degrees and your jobs at NMSU."  Olsen claimed to have adverse information on University administrators and claimed that no one could do anything to him.  Olsen also stated that "I will remain in my positions and then I will make sure that your careers are fucking over at NMSU."  (Moraros Dec. ¶ 26).  Both Bird and Moraros submitted a written complaint to Dean Brandon who responded that Moraros "ought to be careful because Olsen was very powerful and good friends with the Provost."  (Prapasiri Dec. ¶ 14).

In late 2007, Olsen stated to faculty member Carl Kendall that Moraros and Bird had submitted duplicate travel reimbursement requests.  Olsen said that it was very serious and that "I have them now."  Issues with travel reimbursement requests were not uncommon and were generally dealt with by the Department Secretary.  At no time prior to the situation involving Bird and Moraros was a fraud investigation ever conducted with regard to expense reimbursement requests.  (Anderson Dec. ¶ 16).  Even though it was provided as the basis for the termination of Bird and Moraros, the NMSU Internal Auditor, Brenda Shannon, could not conclude they had engaged in deception or an attempt to defraud.  (Robinson dep. pp. 168-69).  Another NMSU faculty member was not terminated even though the same Auditor concluded she did engage in deceptive conduct by enlisting a vendor to change invoices.  *Id.*

Pursuant to NMSU policy, department heads must consult with senior faculty prior to recommending non-renewal of a faculty contract. (Brandon dep. p. 34). The senior faculty with whom Dean Robinson did consult wanted to retain Bird and Moraros. The case of Bird and Moraros is the first instance in which a department head has not followed the recommendation of the senior faculty in this regard. (*Id.* p. 36).

### *Discussion*

In suits alleging race discrimination, the elements of the plaintiff's case are the same whether brought pursuant to §§ 1981 and 1983 or Title VII. *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991). Defendant Olsen does not argue in his motion that Plaintiffs were not members of a protected class, did not suffer adverse actions or were not treated differently from similarly situated persons. Similarly, for purposes of a racially hostile work environment, he does not argue that the harassment was not severe or pervasive, nor does he argue that the harassment was not racial or sexual. Olsen's only substantive argument appears to be the contention that he did not directly participate in any of the employment decisions that resulted from actual discrimination or harassment.[1]

---

[1]     Olsen also does not argue he cannot be personally liable although he does quibble about whether Plaintiffs have "established" his supervisory status.

There can be little doubt that Olsen's language[2] and "[r]epeated use of such highly offensive terms  [email topics] in the work environment (especially considering the fact that racial epithets are meant to denigrate a group of people) may create an objectively hostile work environment ...." *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 272 (7th Cir. 2004).  Moreover, when Olsen's offensive emails were reported to both Chairman Robinson and Dean Brandon, they basically responded that they were well aware of Olsen's proclivities for offensive behavior but that Bird and Moraros should be careful in complaining about such a powerful figure.  The right to be free of such harassment was well established and Olsen is not entitled to qualified immunity on the hostile work environment claim under § 1983.  *Murrell v. School Dist. No. 1, Denver*, 186 F.3d 1238, 1251 (10th Cir. 1999); *Lankford v. City of Hobart*, 27 F.3d 477, 479 (10th Cir. 1994); *cf. Chapman v. Carmike Cinemas*, 307 Fed. Appx. 164, 167 (10th Cir. 2009) (assault by co-employee sufficient to create a fact issue on hostile work environment).  At the least, Defendant Olsen's conduct raises fact issues and therefore he is not entitled to a summary judgment based on the hostile work environment claim. *See Maldonado v. City of Altus*, 433 F.3d 1294 (10th Cir. 2006).

Olsen extends his personal responsibility argument by stating that to establish liability of an individual pursuant to § 1983 that individual must have personally participated in the constitutional violations at issue.  This statement is generally correct.

---

[2]     Olsen is alleged to have repeatedly used "cunt" and "nigger" and asked Moraros about having sex with a "nigger."

*See Serna v. Colo. Dep't of Corrections*, 455 F.3d 1146, 1151 (10th Cir. 2006).  However, the establishment of this proposition does not relieve Olsen of liability based on the qualified immunity defense applied to the present record.

In this regard, Olsen's supervisory authority over Bird and Moraros is itself a disputed issue of material fact.[3]  On the current record, it appears that Bird and Moraros were faculty and doing research within that department.  Indeed, several of their complaints relate directly to Olsen's claimed interference with their research.[4]  Olsen also acted as the thesis advisor and Ph.D. advisor to Plaintiffs Bird and Moraros and was one of a committee required to sign off on their work before they could receive their advanced degrees.[5]  In this role they maintain he insisted on changes beyond the date revisions were permitted by NMSU policy.  During the fall of the 2007 semester, Olsen also acted as Interim Dean of the College of Health and Social Services.  Moreover, Olsen was Associate Dean of Academics and Research during all relevant times.

As the original recitation of facts from Plaintiffs' perspective indicates, Olsen is alleged to have a direct and personal role.  "[I]f there is 'some affirmative link to

---

[3]	The issue is how much control the co-employee had, not his formal position.  *Wright-Simmons v. City of Okla. City*, 155 F.3d 1264, 1271 (10th Cir. 1998); *Zelinski v. Pennsylvania State Police*, 108 Fed. Apps. 700, 703 (3d Cir. 2004).

[4]	Olsen's Reply Brief emphasizes the factual dispute when he responds to this challenge.  "In point of fact, Plaintiffs Moraros and Bird, as first year faculty members, were given the equivalent of a sabbatical leave by Dr. Robinson to complete data collection for their respective Ph.D. dissertations in the Fall of 2007."  (Reply p. 5).

[5]	Olsen's claim that he was only the co-chair of the committee that reviewed the dissertations merely fortifies the factual nature of the dispute.

causally connect the actor with the discriminatory action,' a suit against the individual under § 1981 can be predicated on the actor's personal involvement with the discriminatory action." *Sims v. KCA, Inc.*, 28 F.3d 113(10th Cir. 1994) (quoting *Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978, 983 (10th Cir. 1991)); *Noland v. McAdoo*, 39 F.3d 269, 272 (10th Cir. 1994); *cf. Murrell v. School Dist. No. 1, Denver*, 186 F.3d at 1238 (a public official may be liable under § 1983 for deliberate indifference to harassment). "For liability under section 1983 direct participation is not necessary.  Any official who 'causes' a citizen to be deprived of her constitutional rights can also be liable.  The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1279-80 (10th Cir. 2008) (quoting *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990)).  Once again, issues of material fact exist as to whether Olsen's personal involvement was a cause of the failure to renew Moraros and Bird to their faculty positions. *Hawkins v. County of Oneida*, 497 F. Supp. 2d 362 (N.D.N.Y. 2007).

Both Plaintiffs and the Court agree that *Bolden v. City of Topeka*, 441 F.3d 1129 (10th Cir. 2006), requires Plaintiffs to advance their § 1981 claims under the auspices of § 1983 but that has no impact on the legal conclusions reached herein.  The cases previously cited all deal with § 1983 or both with § 1981 and § 1983 claims.  Plaintiffs

11

have also properly pled their claims of racial discrimination against Olsen.  *See* Compl. ¶¶ 141-53.

## O R D E R

For the above stated reasons, *Defendant Larry Olsen's Motion for Summary Judgment on the Basis of Qualified Immunity* is DENIED.

SO ORDERED this 13th day of November, 2009.

_____
BRUCE D. BLACK
United States District Judge