IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

YELENA BIRD, ROBERT BUCKINGHAM,
FREEDOM CHETENI, JOHN MORAROS
and SATYA RAO,

        Plaintiffs,

vs.                                                             No. CIV 08-851 BB/LAM

REGENTS OF NEW MEXICO STATE UNIVERSITY,
LARRY OLSEN, in his individual capacity,
JAMES ROBINSON, in his individual capacity,
MICHAEL MARTIN, in his individual capacity, and
ROBERT GALLAGHER, in his individual capacity,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Plaintiffs Yelena Bird's and John Moraros' Motion for Partial Summary Judgment Against Defendants Regents of New Mexico State University, Michael Martin, and Robert Gallagher on Retaliation Claims in Counts I, II, III & IV of Third Amended Complaint (Doc. No. 241, filed June 14, 2010). For the reasons stated below, the Court will **DENY** the Motion.

**Factual Background**[1]

Plaintiffs Yelena Bird and John Moraros, wife and husband, were admitted to NMSU's graduate school in 2002, obtained their Masters in Public Health degrees in 2004 and their Ph.D. degrees in 2007. (*See* Motion ¶ 1 at 2). Bird is African-American and Moraros is of Greek and Hispanic background. (*See id*. ¶ 3 at 2). Bird and Moraros served as non-tenure track faculty at NMSU from approximately 2003 to 2007 when they were granted tenure-track faculty status. (*See id*. ¶ 4 at 2). On February 13, 2008 NMSU informed Bird and Moraros that their contracts would

---

[1]Defendants do not dispute the facts set forth in this section.

not be renewed for the 2008-9 school year and that their employment as NMSU faculty would terminate at the end of the Spring 2008 semester. (*See id.* ¶ 5 at 3).

On about February 27, 2008 Bird and Moraros submitted to Department Head James Robinson grievances asserting *inter alia* that the decision to not renew their faculty contracts and terminate their employment at NMSU was a result of illegal discrimination and retaliation. (*See id.* ¶ 7 at 3). Bird and Moraros "had numerous contacts with various members of the press . . . [and] provided detailed information about the discrimination and retaliation [they] had suffered at NMSU, including [their] contention that the non-renewal of [their] faculty contract[s] [were] due to race discrimination and retaliation." (Declaration of Yelena Bird ¶ 11, Motion Ex. B; Declaration of John Moraros ¶ 11, Motion Ex. A). "[T]here was a significant amount of press coverage about Bird and Moraros in the spring of 2008, which at some point began to put NMSU in a negative light. Robert Gallagher, Chairman of the NMSU Board of Regents, followed this press coverage closely." (*Id.* ¶ 9 at 4).

**Retaliation**

Bird and Moraros allege that they were subjected to three types of retaliation: (1) NMSU/Gallagher provided false and derogatory information about Bird and Moraros to the press; (2) Defendants instituted an investigation into possible plagiarism in Bird's and Moraros' masters theses; and (3) Defendants launched an investigation into Bird's and Moraros' academic records and denied them admission to the School of Social Work.

To prevail on a Title VII retaliation claim, plaintiffs must establish "that retaliation played a part in the employment decision." *Fye v. Okla. Corp. Comm.*, 516 F.3d 1217, 1224 (10th Cir. 2008). Plaintiffs may choose one of two ways to meet this burden. They may rely on the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973), "under which the plaintiff bears the initial burden of establishing a prima facie case of discrimination. If the defendant

is [then] able to articulate a legitimate nondiscriminatory reason for the adverse action, the plaintiff must then show that the articulated reasons are a pretext for retaliation." *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 549-50 (10th Cir.1999).

Plaintiffs may also choose to show retaliatory animus directly, "in which case the *McDonnell Douglas* framework is inapplicable." *Medlock*, 164 F.3d at 550. To prevail via this direct method, plaintiffs must present "evidence that directly shows retaliation played a motivating part in the employment decision at issue." *Fye*, 516 F.3d at 1226; *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007). Once plaintiffs meet that burden, "the burden of persuasion shifts to the defendant to prove that it would have taken the same action absent the retaliatory motive." *Fye* at 1225. The phrase "plaintiffs must 'directly' show retaliatory animus in meeting their burden" does not refer to the type of evidence plaintiffs must use. *See Fye*, 516 F.3d at 1226. Plaintiffs can establish retaliation "directly" with either direct or circumstantial evidence. *Id.* at 1226. The circumstantial evidence, however, must "be tied 'directly' to the retaliatory motive." *Id.*

"A plaintiff will be entitled to the burden-shifting analysis [for a mixed-motive case] upon presenting evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged [retaliatory] attitude." *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1512 (10th Cir. 1997) (plaintiff satisfied burden of directly showing retaliatory motive when people involved in the promotion decision expressly stated that plaintiff would not be considered due to his discrimination complaint); *Fye*, 516 F.3d at 1227 (termination letter that reflected agency's concern for restructuring of the agency and did not suggest that the agency considered anything other than the demands made by the employee did not directly reflect a retaliatory motive); *Medlock*, 164 F.3d at 550 (suspension letter that admitted on its face that the employer considered the subject matter of the plaintiff's deposition, which included testimony about his race discrimination claim, was sufficient evidence that directly reflected the retaliatory motive).

Bird and Moraros have chosen to show retaliatory animus via the direct method rather than rely on the *McDonnell Douglas* framework. (*See* Motion at 12; Reply at 4).

**Statements to the Press**

Bird and Moraros set forth the following facts regarding retaliation via statements made to the press:

"NMSU administration held frequent meetings, during the spring of 2008, to determine how to respond to and counter the press coverage related to Bird and Moraros." (Motion ¶ 10 at 4). "Bird and Moraros gave interviews to and were quoted by numerous press outlets regarding the discrimination and retaliation at NMSU." (Motion ¶ 11 at 4).

"Gallagher became concerned that the negative publicity was casting NMSU in a poor light and that negative consequences could result due to this media attention, including reduced financial support from donors, reduced applications and/or enrollment, or problems in recruiting faculty, particularly minority faculty and staff." (*Id.* ¶ 12 at 4). "Gallagher believed NMSU had a duty to make sure the negative press was not affecting the university." (*Id.*).

"The information Gallagher was specifically concerned could damage NMSU was comments that NMSU retaliated against people who spoke their minds and that it hired and fired based on race." (*Id.* ¶ 13 at 4-5). "Gallagher was particularly concerned because these allegations were in the public domain. Bird and Moraros were the sources of this information." (*Id.* ¶ 13 at 5).

"Gallagher had ongoing discussions with the top management of NMSU and with the other regents and there was discussion about a press strategy to counter the potentially serious damage from the negative publicity." (*Id.* ¶ 14 at 5). "He and the other regents discussed and agreed that NMSU was being dragged down and it could have negative consequences so they needed to make sure that additional information was disseminated." (*Id.*).

"Gallagher decided to put additional 'factual' information out to the press to counter the potential damage he believed NMSU could suffer due to the negative coverage prompted by Moraros' and Bird's communications with the press." (*Id.* ¶ 15 at 5). "Gallagher therefore gave press interviews and even wrote an article that was published in the Las Cruces Sun News in which he was quoted making a number of statements regarding Bird and Moraros." (*Id.* ¶ 16 at 5). "Statements made by Gallagher include allegations that:

a. Bird and Moraros were 'wrongfully' hired against faculty and department head recommendations;

b. Notes in Bird's and Moraros' files warned they would be likely to sue NMSU for discrimination;

c. Bird and Moraros refused to provide information about their prior academic transcripts and degrees requested of them by NMSU; and

d. By submitting duplicate travel reimbursement requests to NMSU for the same travel Bird and Moraros committed 'fraud' against NMSU." (*Id.*).

"Gallagher relied solely on information from others in making these statements to the press and did nothing to independently verify the accuracy of the representations." (*Id.* ¶ 17 at 6). "With regard to the allegation that Bird and Moraros were 'wrongfully' hired Gallagher actually discussed the matter with the prior provost, who authorized the hires, and was told that there was nothing wrongful about the hiring process." (*Id.*).

Plaintiffs Bird and Moraros argue that Gallagher, after discussing the matter with other regents, gave press interviews where he "made four distinctly false statements about Bird and Moraros that were clearly designed to cast them in a negative light" because "each of these statements tended to cast aspersions on them as persons and as professionals." (Motion at 14-15).

Plaintiffs conclude that Gallagher's testimony establishes the requisite retaliatory motivation. (*See id.* at 17-20). The Court disagrees.

The Court has reviewed those portions of Gallagher's testimony cited by Plaintiffs to support their material facts. Gallagher's testimony does not indicate he or the other regents and officials at NMSU considered anything other than mitigating the negative consequences of the press coverage when deciding to make a statement to the press. Instead of "directly reflecting" a retaliatory motive, Gallagher's testimony indicates his and others' concern that the "information being disseminated to the press is balanced information and not just from one side." (Motion Ex. H at 85:13-22). Gallagher's testimony does not contain statements from which a reasonable inference of retaliatory animus may be drawn.

**Qualified Immunity**

Defendants include a two-paragraph section, "F. Comments by Regent Gallagher," in their Response. (See Doc. No. 274 at 10-12). The first paragraph states that "at the time Mr. Gallagher was interviewed [by the press] he was neither the supervisor nor the employer of the plaintiffs, and [was] speaking in his individual capacity." (*Id.* at 11). The second paragraph states "Gallagher is entitled to assert qualified immunity." (*Id.* at 11-12).

The Court will not decide at this time whether Gallagher is entitled to qualified immunity because his two-paragraph argument does not qualify as a sufficient motion.[2] *See* FED. R. CIV. P. 7(b)(1)(B) (a motion must state with particularity the grounds for seeking the order); D.N.M.LR-Civ. 56.1(b) (memorandum in support of motion for summary judgment must state all material facts and refer with particularity to those portions of the record upon which movant relies). A qualified immunity "analysis can only proceed after the court determines that a defendant is entitled to assert

---

[2]Gallagher does not have a pending motion for summary judgment based on qualified immunity.

6

qualified immunity in the first instance." *Weise v. Casper*, 507 F.3d 1260, 1264 (10th Cir. 2007); *see also Wyatt v. Cole*, 504 U.S. 158, 168-169 (1992) (qualified immunity is not always available to private defendants charged with § 1983 liability).

**Plagiarism Investigation**

Bird and Moraros set forth the following facts regarding retaliation relating to the plagiarism investigation:

"In the summer of 2008, after Bird and Moraros were terminated from their faculty appointments at NMSU allegations surfaced that there was plagiarism in their masters theses." (Motion ¶ 20 at 6). "These allegations were first made by then-President Michael Martin. Martin sought out and reviewed Bird's and Moraros' 2004 theses during the summer of 2008." (*Id.* ¶ 21 at 6). "The basis for Martin's action was allegedly a conversation with three separate Biology and Biochemistry professors who approached Martin, individually, and expressed concerns that Dr. Bird was incapable of writing a thesis or a dissertation on her own." (*Id.* ¶ 22 at 6). "One of the professors, Dr. John Gustafson, denied making these allegations to Martin regarding Bird's writing abilities. However, he did confirm that he made other negative statements to Martin about Bird and Moraros and that his basis for doing so was the negative media attention directed at NMSU as a result of Bird's and Moraros' speech." (*Id.* ¶ 22 at 7).

"Martin had not previously examined the theses or dissertations of any other NMSU students to evaluate potential irregularities." (*Id.* ¶ 23 at 7). "Upon reviewing the theses of Bird and Moraros, Martin advised then-Provost, Waded Cruzado, then-Dean of the College of Health and Social Services, Jeffrey Brandon and Linda Lacey, Dean of the Graduate School that he, University General Counsel Bruce Kite, former University counsel and assistant to the President Christina Chavez-Kelly and Lowell Catlett, Dean of the College of Agriculture had read Moraros' and Bird's masters theses and 'all agree it is clearly plagiarism.'" (*Id.* ¶ 24 at 7). "Martin further recommended

to Cruzado, Lacey and Brandon that Bird's masters degree be rescinded and that any journal in which Bird had published be notified of 'questions about the integrity of her work.'" (*Id.*). "Martin's recommendation to the Provost, Dr. Cruzado, that journals be notified about questions concerning the integrity of Bird's work, was against University policy."[3] (*Id.* ¶ 25 at 7).

"Martin also requested that Martin Creider, a University librarian, review the theses for evidence of plagiarism, particularly in the methodology sections. In making his request, Martin advised Creider of his 'current angst' against Bird and Moraros." (*Id.* ¶ 26 at 7-8). "Creider in turn suggested that Martin speak to Dr. Larry Olsen, who had acted as both Bird's and Moraros' thesis advisor, to determine what Olsen required of his advisees in terms of methodology. Martin never did so." (*Id.* ¶ 26 at 8).

"Martin also instructed Linda Lacey, Dean of the Graduate School to review the theses and to review whether the masters theses of Bird and/or Moraros should be rescinded. Prior to the conduct of any formal investigation, Martin informed Lacey, 'the chair and committee [of Bird's and Moraros' theses] are your faculty and . . . your faculty blew this one and perhaps more.'" (*Id.* ¶ 27 at 8). "Lacey followed Martin's instructions and discussed possible rescission of the degrees and the process for rescinding the degrees with University General Counsel, Bruce Kite." (*Id.*).

"Martin also requested that Robert Buckingham, then a professor in the Department of Health Science, investigate Bird's and Moraros' theses for plagiarism." (*Id.* ¶ 28 at 8). "In written correspondence with Buckingham on this issue, Martin stated, 'I'm tired of reading the repetitious

---

[3]Plaintiffs mischaracterize Martin's deposition testimony. (*See* Motion Ex. E at 96:1-99:7). Martin indicated that while he makes recommendations to the regents, on some issues it would be outside of NMSU policy to make a unilateral recommendation to the regents. His testimony touches on three issues: (1) plagiarism investigation; (2) rescinding a degree; and (3) notifying journals. It is not clear on which of the three issues his recommendation to the regents would be "out of policy." He does not testify that his recommendation to the Provost was against NMSU policy and states his recommendation to the Provost is "irrelevant" because "in this case, the recommendation [to the regents] could only come out of the process."

bullshit every morning about all that is wrong in CHSS and NMSU.' Martin further advised Buckingham that, 'if the beat goes on I intend to take a more aggressive stand on behalf of the good people whose reputations have been sullied in all this.'" (*Id.*).

"Neither Bird nor Moraros were spoken to by NMSU representatives regarding the alleged plagiarism in their masters theses, but the allegations were reported in the press, along with the threat to revoke the degrees of either Bird or Moraros or both." (*Id.* ¶ 29 at 9).

"The plagiarism charges against Bird and Moraros . . . were triggered by Bird's and Moraros' public allegations against NMSU." (*Id.* ¶ 34 at 10). "The Graduate School brought in a senior member of the Biology Department and of the NMSU writing center to evaluate the plagiarism allegations. These experts found there was no evidence of plagiarism and recommended the case against Bird and Moraros be dropped." (*Id.* ¶ 35 at 10).

Plaintiffs contend that the plagiarism "allegations were first brought up by NMSU . . . President Michael Martin" and that Martin "accused Bird and Moraros of plagiarism, threatened their degrees, and launched an investigation into the baseless plagiarism allegations due to his retaliatory motivation." (Motion at 15, 20). The Court reviewed the exhibits upon which Plaintiffs rely to support their argument. In his deposition, Martin testified that "a couple of different faculty members suggested to me that they had serious concerns about whether or not Bird in particular could write a complete thesis or dissertation, and therefore someone ought to review her work." (Motion Ex. E at 78:25-79:4; *see also* 82:10-84:18, 86:21-87:12). Martin also testified that he did not want to "react beyond the boundaries of our policies and procedures, so I asked Larry for his opinion . . . I sent it all to Linda Lacey. And I stepped away and let the process carry itself out." (*Id.* at 103:16-20.). Martin's testimony does not directly show that retaliation was a motivating factor in his decision to investigate possible plagiarism.

Plaintiffs also contend that Martin's acknowledgment of his "'angst' toward Bird and Moraros [ ] establishes that his motivation was retaliatory." (Motion at 20). In an email requesting a University librarian to review Bird's and Moraros' theses for evidence of plagiarism Martin wrote: "I turn to you as a professional because I don't want my current angst over these [two] to cloud my judgment." (Motion Ex. N). Martin's statement in his email reflects his concern that the review of the theses not be affected by personal feelings.[4] Neither Martin's statement nor the word "angst," meaning "anxiety," reflect a retaliatory motive. *See Gorny v. Salazar*, 2011 WL 596129 slip op. 2 (10th Cir.) (statement supervisor did not trust employee not foundation for retaliation).

Plaintiffs support their argument by quoting Martin as stating in another email relating to possible plagiarism 'if the beat goes on I intend to take a more aggressive stand on behalf of the good people whose reputations have been sullied in all this.'" (Motion ¶ 28 at 8). Martin's statement is somewhat vague and is taken from a series of emails between Martin and Plaintiff Buckingham that spans six pages. While those emails do relate to possible plagiarism, they also mention the standards and reputation of NMSU, the integrity of co-authors, and a discussion between Martin and Buckingham. (Motion Ex. R). Having reviewed the context of the entire email, and not having any information on the subject of the discussion between Martin and Buckingham, the Court cannot conclude that the proper interpretation of Martin's statement shows retaliatory animus played a part in the decision to investigate the plagiarism allegations. *See Danville v. Regional Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002).

Plaintiffs assert that "The plagiarism charges against Bird and Moraros . . . were triggered by Bird's and Moraros' public allegations against NMSU." (Motion ¶ 34 at 10). They support their

---

[4]In his deposition Martin explained the meaning of that comment by stating "That means the whole series of events that was unfolding at that college had us all discomforted, and I didn't want any of that discomfort to color the view of the judgment with respect to these two faculty members, or former faculty members." (Motion Ex. E at 102:22-103:6).

10

contention by quoting Defendant Regent Gallagher who stated, regarding the plagiarism and academic records investigations, that "Based on [Bird's and Moraros'] public comments,[5] I think the university was duty-bound to take a look at the whole situation." (Motion Ex. H at 71:3-5). Gallagher's statement reflects his opinion that NMSU had an obligation to investigate matters raised by Bird's and Moraros' public comments. It does not directly reflect that retaliation played a motivating part in those investigations.

The Court, having carefully reviewed Plaintiffs' material facts and the supporting exhibits regarding the plagiarism investigation, finds that Plaintiffs' evidence of Martin's conduct and statements does not directly reflect a retaliatory attitude.

**Academic Records Investigation**

Bird and Moraros set forth the following facts regarding retaliation relating to the academic records investigation:

"In the late spring of 2008 Bird and Moraros applied for admission to a masters in social work program at NMSU's school of social work." (Motion ¶ 30 at 9). "Also in the late spring of 2008, Jeffrey Brandon, then-Dean of the College of Health and Social Services, learned that Bird and Moraros might have applied for the masters' program. He quickly contacted Luis Vazquez, then-Interim Department Chair for Health Science, advising him that the prospect of having Bird and Moraros in the program was of great concern for him." (*Id.* ¶ 31 at 9).

"In the summer of 2008 NMSU Registrar Zimmerman was asked by NMSU Provost Cruzado to evaluate Bird's and Moraros' academic credentials, specifically whether their medical degrees were awarded as they claimed. This request was unusual[6] and was the only such request Zimmerman

---

[5]Gallagher does not, at the cited portion of his deposition, specify which public comments he is referring to.

[6]In his deposition Martin testified that it was "customary" or "common" for the provost to ask him to evaluate credentials but later testified that "It's not common. It's more an exception than

11

received from the university provost in 2006, 2007 or 2008." (*Id.* ¶ 32 at 9). "Bird and Moraros had already earned two degrees at NMSU (MPH degrees in 2004 and Ph.D. degrees in 2007) and Zimmerman had never before had a situation where a student had already obtained two different degrees from NMSU and yet he was asked by high-level administration to evaluate the student's credentials." (*Id.* ¶ 33 at 9). "The question was initiated due to the termination of Bird and Moraros from the NMSU faculty." (*Id.*). "The investigation into their academic records [was] triggered by Bird's and Moraros' public allegations against NMSU following their terminations." (*Id.* ¶ 34 at 10).

"The investigation into Bird's and Moraros' academic records proceeded. The transcripts for both Bird and Moraros show conferral of a diploma as a medical surgeon." (*Id.* ¶ 36 at 10). "In the summer of 2008, the Autonomous University of the City of Juarez, the university that conferred medical degrees on Bird and Moraros, issued official letters to NMSU, at the request of Bird and Moraros, confirming that Bird and Moraros graduated and were awarded medical doctorate diplomas in June 2002." (*Id.* ¶ 37 at 10).

"In September 2008 NMSU rescinded Bird's and Moraros' admission into the school of social work and accused them of having misrepresented their academic records. This deprived Bird and Moraros of the opportunity to continue their medical research at NSMU as co-investigators under a National Institutes of Health grant that had been applied for." (*Id.* ¶ 38 at 11).

Plaintiffs allege that the investigation of their academic credentials "was initiated due to the termination of Bird and Moraros from the NMSU faculty." (Motion ¶ 33 at 9). Defendants deny this allegation stating Zimmerman clearly stated that the investigation was initiated due to Plaintiffs application to the School of Social Work. (*See* Response ¶ 16 at 4). Zimmerman's testimony, which Plaintiffs use to support their allegation, is somewhat ambiguous:

---

a rule." (Motion Ex. T 14:9-15 and 15:2-6).

> Q: And did you become aware that Moraros and Bird, despite being terminated as faculty members, had applied for admission to the School of Social Work?
>
> A: Yes, I believe I mentioned that earlier. That's what initiated that question.

(Motion Ex. T at 19:9-13). The Court need not resolve any ambiguity at this time. Even if the investigation was initiated due to Plaintiffs' termination, the issue before the Court is whether there is evidence that directly shows that retaliation played a motivating part in Defendants decision to investigate Bird's and Moraros' academic records. Zimmerman's testimony does not directly reflect retaliatory animus related to any statements made by Plaintiffs. *Cf. Couch v. Board of Trs. of Mem'l Hosp. of Carbon County*, 587 F.3d 1223, 1238 (10th Cir. 2009) (investigation resulting from external events not basis of retaliation).

**Conclusion**

Plaintiffs submitted evidence in support of their claim of retaliation arising from Defendants' statements to the press and Defendants' investigations of alleged plagiarism and Plaintiffs' academic records. None of the evidence, however, directly reflects a retaliatory animus. The Court will, therefore, deny Plaintiffs' Motion. *See Fye.*, 516 F.3d at 1226 ("A mixed-motive case is not established, and the *Price Waterhouse* framework does not apply, until the plaintiff presents evidence that directly shows that retaliation played a motivating part in the employment decision at issue"); *Hook v. Young*, 28 F.3d 366, 374 (10th Cir. 1994) ("Evidence establishing a *prima facie* case is not always sufficient to require or permit a mixed-motives burden shifting instruction").

**IT IS SO ORDERED.**

                                                    */s/ Bruce D. Black*
                                                    **BRUCE D. BLACK**
                                                    **CHIEF UNITED STATES DISTRICT JUDGE**