**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

YELENA BIRD, ROBERT BUCKINGHAM,
FREEDOM CHETENI, JOHN MORAROS
and  SATYA RAO,

                 Plaintiffs,

vs.                                                                  No. CIV 08-851 BB/LAM

REGENTS OF NEW MEXICO STATE UNIVERSITY,
LARRY OLSEN, in his individual capacity,
JAMES ROBINSON, in his individual capacity,
MICHAEL MARTIN, in his individual capacity,
ROBERT GALLAGHER, in his individual capacity, and
MICHAEL ZIMMERMAN, in his individual capacity,

                 Defendants.

## MEMORANDUM OPINION AND ORDER

      **THIS MATTER** comes before the Court on the Revised Motion for Summary Judgment based on Qualified Immunity of Defendant Michael Martin (Doc. No. 390, filed April 15, 2011). For the reasons stated below, the Court will **GRANT** the Motion.

**Background**

      Defendant Michael Martin was the President of New Mexico State University ("NMSU"). (*See* Motion at 2).  Plaintiffs Yelena Bird, an African American, and John Moraros, a Hispanic, completed their Master's theses at NMSU and later became faculty members at NMSU.  (*See* Fourth Amended Complaint at 1-4, Doc. No. 348, filed January 18, 2011).  Bird and Moraros allege that Martin retaliated against them for their opposition to discrimination and retaliation issues at NMSU by initiating a plagiarism investigation and threatening to revoke their degrees.  (*See id.* at 32-35).

**Legal Standard**

Bird and Moraros have asserted retaliation claims against Martin under 42 U.S.C. § 1981 and the First Amendment.  (Fourth Amended Complaint ¶¶ 154 and 167, Doc. No. 348, filed January 18, 2011).  To establish a prima facie case of retaliation under Section 1981, a plaintiff  must show "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."  *Somoza v. University of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008).  To prove a First Amendment retaliation claim, a plaintiff "must establish that (1) she was engaged in constitutionally protected activity, (2) the defendants' actions caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that  protected activity, and (3) the defendant [sic] actions were substantially motivated as a response to her protected conduct."  *McBeth v. Himes*, 598 F.3d 708, 724 (10th Cir. 2010).

Martin now moves for summary judgment based on qualified immunity.  "When the qualified immunity inquiry turns on a subjective element, as it does when examining motive, the qualified immunity analysis is 'modified slightly.'"  *McBeth v. Himes*, 598 F.3d 708, 724 (10th Cir. 2010) (applying slightly modified analysis to a First Amendment retaliation claim).  "The defendant must do more than merely raise the [qualified] immunity defense; he must make a prima facie showing of the objective reasonableness of the challenged conduct."  *Id.*  "If the defendant makes this prima facie showing, the plaintiff must then produce specific evidence of the defendant's culpable state of mind to survive summary judgment."  *Id.* at 724-725; *see also Bruning v. Pixler*, 949 F.2d 352, 356 (10th Cir. 1991) (qualified immunity procedure must be modified slightly when plaintiff's claim contains a subjective element, such as defendant's purpose, motive, or intent).

2

**Prima Facie Showing of Reasonable Objectiveness**

Martin has made a prima facie showing that he was objectively reasonable in initiating a plagiarism investigation.  Martin testified that two faculty members, Dr. Gustafson and Dr. Kuehn, approached Martin at different times and they had "serious concerns about whether or not Bird in particular could write a complete thesis or dissertation, and therefore someone ought to review her work."  (Deposition of Michael Martin at 78:20-79:24, Revised Memorandum of Law in Support of Motion ("Mem.") Ex. D, Doc. No. 391-4, filed April 15, 2011).  Martin reviewed Bird and Moraros' theses, "found evidence of plagiarism," and contacted Dean Linda Lacey and requested "a more thorough examination."  (Martin Dep. at 87:13-25; Deposition of Linda Lacey at 22:4-15, Mem. Ex. F, doc. No. 391-6; Plaintiffs's Response Ex. 21, Doc. No. 399-6, filed May 13, 2011).  The NMSU Policy Manual requires that "[a]llegations regarding academic misconduct [which includes plagiarism] . . . shall be brought immediately to the attention of the appropriate dean."  (Mem. Ex. G and H).

Bird and Moraros argue that "there is nothing in the record to indicate that the 'reports' Martin claims to have received [from Dr. Gustafson and Dr. Kuehn] were *ever* made."  (Response at 14) (*emphasis in original*).  Bird and Moraros cite to Dr. Gustafson's deposition in which he testifies that he did not "indicate to President Martin that [he] didn't feel that Dr. Bird was capable of writing her own dissertation or thesis."  (Gustafson Dep. at 15:11-14; Response Ex. 20).

Bird and Moraros do not cite to any portion of the record to dispute Martin's testimony that Dr. Kuehn told Martin that he had "serious concerns about whether or not Bird in particular could

write a complete thesis or dissertation, and therefore someone ought to review her work."[1]  *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact is . . . genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing . . . that an adverse party cannot produce admissible evidence to support the fact").  Instead, Bird and Moraros suggest, without citing any legal authority, that Martin may not be "permitted to testify concerning the out-of-court statements of non-witnesses."  (Response at 14).  Martin offered Dr. Kuehn's statement not for the truth of the mattered asserted, but to explain why Martin initiated the plagiarism investigation.  *See* Fed. R. Evid. 801(c) (defining "hearsay" as statements the declarant does not make while testifying and that "a party offers in evidence to prove the truth of the matter asserted in the statement"); *United States v. Freeman*, 816 F.2d 558, 563 (10th Cir.1986) ("[O]ut of court statements are not hearsay when offered for the limited purpose of explaining why a Government investigation was undertaken").

Disregarding Martin's reference to Dr. Gustafson's alleged statement, Martin has made a prima facie showing that he was objectively reasonable in initiating a plagiarism investigation.  The record indicates that: (1) Dr. Keuhn approached Martin and indicated that someone ought to review Bird's work; (2) Martin reviewed Bird's and Moraros' theses and found evidence of plagiarism; and (3) Martin has the authority and obligation to initiate investigations of potential plagiarism.

**Specific Evidence of Martin's State of Mind**

With Martin having made a prima facie showing of the reasonable objectiveness of initiating a plagiarism investigation, Plaintiffs must now produce specific evidence of Martin's culpable state

---

[1]Bird and Moraros indicate that they did not depose Dr. Kuehn because Defendants did not list him as a trial witness.  (*See* Response at 14).

of mind to survive summary judgment. *See McBeth v. Himes*, 598 F.3d at 724-725. Plaintiffs state

that "there is significant evidence that the [plagiarism] investigation was motivated by an intention

to discriminate." (Response at 16, citing Additional Material Facts 27-29, 32, 34). The Additional

Material Facts cited by Plaintiffs state:

> 27.    Before any investigation was conducted, Martin advised [Dean] Lacey that the members of graduate committees are "your [Lacey's] faculty" and "your faculty blew this one." In other words, he advised the Dean responsible for the investigation that he as the senior most University official, believed there was plagiarism, before any investigation began.

> 28.    Martin did not only forward the matter to Lacey, as per NMSU policy. Instead, he advised numerous NMSU administrators and faculty about his alleged "suspicions" of plagiarism, allegedly to obtain their "opinions" about the matter. These individuals included Chris Erickson, Jim Peach, Lowell Catlett, Christina Chavez-Kelly, Bruce Kite, Waded Cruzado, Robert Buckingham, Martin Creider and Robert Gallagher.

> 29.    When Martin advised Cruzado of his plagiarism allegations, he also informed her that he had provided copies of the theses to University General Counsel, Bruce Kite, Christina Chavez-Kelly and Lowell Catlett and that "all agree it is clearly plagiarism." He recommended to Cruzado that Bird's masters' [sic] degree be revoked immediately and that all journals in which she had published her work be notified of "questions about the integrity of her work."

> 32.    Martin asked Erickson and Peach, NMSU economics faculty and Regents' task force members, to review Bird's and Moraros' theses. Neither were involved in the investigation being conducted by Lacey, which was the only investigation called for by any NMSU policy.

> 34.    Martin approached Dr. Buckingham, then a faculty member in the Department of Health Science and asked him to investigate plagiarism in Bird's and Moraros' theses. No such investigation was called for by NMSU policy. During this meeting, Buckingham said he believed the plagiarism allegations were retaliatory and were made because Bird and Moraros spoke to the media about discrimination. Martin became very agitated and told Buckingham that he was "tired of seeing [Buckingham's] name" in the press. He also threatened to release a "three-inch thick file" of "unsavory information" and to frame Buckingham as a "sexual predator" if he refused to cooperate. Martin also threatened that Buckingham's failure to cooperate would lead to questions about his own academic integrity.

(Response at 7-9) (citations omitted).

Plaintiffs quote selectively from an email exchange between Martin and Dean Lacey to support their contention in Additional Material Fact 27 that Martin advised Dean Lacey that he believed there was plagiarism.  In his email, Martin stated:

> with modest review I've found evidence of plagiarism in the Bird and Moraros['] masters theses.  This calls for a more thorough examination and, if substantiated withdrawal of degrees.  It also may suggest that we have a quality control issue here that demands a response. . . .  Read pages 48-50 of Bird and 70-73 of Moraros. There are several ph[r]ases that are identical. . . . Larry Olsen is the prof on both . . . At the end of the day the control of this falls to the grad school to maintain the intergrity [sic] of our degrees.  It took me 12 minutes of reading to discover  that the methodology sections of both appear to have been written by the same person.

(Response Ex. 21).  Martin did not advise Dean Lacey he believed there was plagiarism.  Martin only stated that he found evidence of plagiarism, identified the specific locations where the identical phrases appeared, and indicated that the evidence "calls for a more thorough examination."

In Additional Material Fact 28, Plaintiffs cite a portion of Martin's deposition to support their assertion that Martin "advised numerous NMSU administrators and faculty about his alleged 'suspicions' of plagiarism."  (Response at 7).  Nowhere in the cited portion of his deposition does Martin state he advised anyone of his "suspicions" of plagiarism.  Martin testified that he asked two faculty members, Chris Erickson and Jim Peach, about "other instances of plagiarism in their experience here" and "what they knew about these circumstances."  (Response Ex. 2 at 86:13-20). It is not clear from the cited portion of Martin's deposition what the substance or context was of Martin's conversations with the other persons listed in Additional Material Fact 28.

Plaintiffs argue that when Martin discussed the plagiarism issue with persons other than Dean Lacey, his conduct exceeded NMSU policy thereby providing evidence of his retaliatory

motive.  (*See* Response at 17).  Plaintiffs admit that Martin informing Dean Lacey of his concerns

was in accordance with policy.  (*See id.*).  Plaintiffs contend that "there was no basis, absent a desire

to retaliate," for Martin to discuss the plagiarism issue with persons other than Dean Lacey.  (*Id.*).

Plaintiffs do not dispute that as President, Martin was the chief executive officer of NMSU, was

responsible for the employment, advancement, and dismissal of all staff and faculty, made key

policy decisions, and "chaired the administrative council and the academic dean's council, both of

which set policy and deal with the administration" of NMSU.  (Revised Mem. at 2).  Nor do

Plaintiffs dispute that Martin, "as part of his position as President, also looked at a wide variety of

issues that could affect NMSU's reputation or status."  (Revised Mem. at 4).  Martin's undisputed

facts regarding his role as president indicate he has broad authority in the administration of NMSU.

Plaintiffs have not shown Martin's discussions about the plagiarism issue with persons other than

Dean Lacey "exceeded" NMSU policy or were otherwise prohibited or inappropriate.

  Plaintiffs also state that "there is ample evidence of Martin's improper motivation."

(Response at 17) (citing Additional Material Facts 5, 8-11, 18-19, 32, 34).  Plaintiffs' Additional

Material Fact 5 states "On July 11, 2008, Martin completed a statement on behalf of the University

responding to Drs. Bird's and Moraros' amended EEOC charges, thereby confirming his knowledge

of those charges."  (Response at 3).  Martin read Bird's and Moraros' theses on June 30, 2008, and

contacted Provost Cruzado and Dean Lacey on July 1, 2008, to initiate the plagiarism investigation.

(*See* Response Exhibits 10 and 21).  Plaintiffs do not explain how Martin's knowledge, on July 11,

2008, of Bird's and Moraros' EEOC complaints is evidence of a retaliatory motive for initiating a

plagiarism investigation 10 days earlier.

Plaintiffs' Additional Material Fact 8 indicates that Martin asked members of a task force, convened to investigate the terminations of Bird and Moraros, to look into plagiarism allegations before the task force finished its work, thereby "destroying the alleged neutrality of the task force." (Response at 3).  Plaintiffs cite two portions of the record to support Additional Material Fact 8. One, a portion of Martin's deposition, does not indicate when he asked members of the task force to look into plagiarism allegations.  The other, an email to Provost Cruzado, indicates that Martin read Bird's and Moraros' theses on June 30, 2008, and suggests that the plagiarism investigation did not begin until July 1, 2008.  The Final Report of the task force is dated June 2008.  (*See* Response Ex. 9).  Plaintiffs have not cited to any portions of the record that supports their contention that Martin asked members of the task force to look into plagiarism allegations before the task force finished its work.

Plaintiffs' Additional Material Fact 9 indicates that during a student-led protest of the terminations of Bird and Moraros, a professor encouraged Martin to investigate the terminations. (*See* Response 4).  In response, Martin allegedly advised the professor to "stay out of it" and instructed the professor to "not get involved in this mess."  (*See id.*).  Plaintiffs do not explain how Martin's advice to the professor, in March of 2008, regarding the terminations of Bird and Moraros constitutes evidence of Martin's state of mind when he initiated the plagiarism investigation in early July 2008.

Plaintiffs' Additional Material Fact 10 states that Martin "referred to one protest, largely made up of women, as 'more like a sewing circle.'"  The cited portion of the record, Martin's deposition, does not indicate the protest was "largely made up of women."  (*See* Response Ex. 2). After hearing that the protest consisted of "three people," Martin stated that "it was much more like

a cribbage game or a sewing circle." (*Id.*).  Additional Material Fact 10 also states that "[w]hen a student group petitioned for the reinstatement of Bird and Moraros, Martin said petitions didn't mean anything and he could obtain "1,000 signatures" by the next day to turn the University library "into a sports bar." (Response at 4).  Martin's full statement regarding petitions reads:

> Yeah, the students said they were going to petition.  And I think I said to them, "You certainly have a right to petition.  But we don't run the university on petitions."  I said, "In all likelihood, I could get several thousand signatures to turn the library into a sports bar, but we're not going to do that."

(Response Ex. 2).  Martin's statements regarding the size of a protest and the futility of petitions is not specific evidence of a retaliatory motive for initiating the plagiarism investigation.

Plaintiffs' Additional Material Fact 11 states that Martin told a member of the NMSU Board of Regents "that Bird and Moraros had failed to follow University policy by submitting grievances to the OIE [the board that is charged with investigating complaints that involve allegations of discrimination] [when] Martin knew this to be false." (Response at 4).  Plaintiffs do not explain how Martin's allegedly false statement to the Regent regarding Bird and Moraros' discrimination allegations shows Martin's culpable state of mind when he initiated the plagiarism investigation.

Plaintiffs' Additional Material Fact 18 states: "The press reported Martin's plagiarism allegations against Bird and Moraros and the threat to revoke their degrees." (Response at 5).  The portions of the record cited to support this fact, paragraphs 17 of Bird's and Moraros' declarations, do not mention Martin, the press or plagiarism allegations.  (*See* Response Exhibits 17 and 18). Even if the cited portions of the record supported Additional Material Fact 18, that the press reported Martin's alleged "plagiarism allegations," it does not constitute specific evidence of Martin's state of mind.

Plaintiffs' Additional Material Fact 19 asserts that "Martin stated that a 'small but unscrupulous gang' is determined to harm others to 'protect their own incompetence' . . . [Dean Jeffrey] Brandon believes Martin's letter references the Plaintiffs."  (Response at 6).  When asked during his deposition what his understanding of who Martin was referring to as a "small, but unscrupulous gang," Brandon responded:  "I would be guessing, but I would assume it would probably be most of the plaintiffs in this situation."  (Response Ex. 5).  Martin referred to a "small, but unscrupulous gang" in an email to Brandon on July 7, 2008, approximately one week after Martin initiated the plagiarism investigation.  Plaintiffs do not explain how Brandon's guess or assumption about Martin's reference to a "small, but unscrupulous gang," made after Martin initiated the plagiarism investigation, constitutes specific evidence of Martin's state of mind when he initiated the plagiarism investigation.

Plaintiffs have not cited any evidence to refute Martin's prima facie showing of the reasonable objectiveness of initiating a plagiarism investigation after Dr. Kuehn expressed a concern about Bird's ability to write a thesis and suggested that someone should review her work, and after Martin personally reviewed Bird's and Moraros' theses and found identical phrases in both theses. Plaintiffs have not produced any specific evidence that shows that Martin's motive in initiating the plagiarism investigation was to retaliate against Plaintiffs for speaking out against racial discrimination.  The Court will grant Martin's motion for summary judgment based on qualified immunity.

**IT IS SO ORDERED.**

**BRUCE D. BLACK**
**CHIEF UNITED STATES DISTRICT JUDGE**

10