IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

YELENA BIRD, ROBERT BUCKINGHAM,
FREEDOM CHETENI, JOHN MORAROS
and  SATYA RAO,

     Plaintiffs,

vs.           No. CIV 08-851 BB/LAM

REGENTS OF NEW MEXICO STATE UNIVERSITY,
LARRY OLSEN, in his individual capacity,
JAMES ROBINSON, in his individual capacity,
MICHAEL MARTIN, in his individual capacity,
ROBERT GALLAGHER, in his individual capacity, and
MICHAEL ZIMMERMAN, in his individual capacity,

     Defendants.


## MEMORANDUM OPINION AND ORDER

  **THIS MATTER** comes before the Court on the Defendants NMSU and James Robinson's

Revised Motion for Summary Judgment (Doc. No. 388, filed April 15, 2011).  For the reasons stated

below, the Motion will be **GRANTED in part** and **DENIED in part.**

**Background**

  Plaintiffs Yelena Bird, an African American, and John Moraros, a Hispanic, were faculty

members in the Department of Health Science at New Mexico State University ("NMSU").  (*See*

Fourth Amended Complaint at 1-4, Doc. No. 348, filed January 18, 2011).  Defendant James

Robinson was the Department Chair for the Department of Health Sciences at NMSU.  (*See id.* at

2).  "On or about February 11, 2008, Bird and Moraros were separately called into meetings with

Robinson, [Dean Jeffrey] Brandon, and a University auditor and were accused of fraud for

inadvertently submitting duplicate reimbursement request forms for business expenses in the amount

of approximately $800.00."  (*Id.* at 9).  On February 13, 2008, Robinson informed Bird and Moraros

that their employment contracts with NMSU would terminate in May 2008 and would not be renewed for the following school year.  (*See id.* at 10).  Bird and Moraros allege that NMSU and Robinson discriminated against them due to their race and retaliated against them for their opposition to discrimination and retaliation issues at NMSU by not renewing their employment contracts.  (*See id.* at 30-35).

**Burden Shifting**

The burden-shifting framework set forth in *McDonnell Douglas Corp v. Green,* 411 U.S. 792 (1973) applies when a plaintiff relies on circumstantial evidence to demonstrate employment discrimination at summary judgment.  Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of employment discrimination.[1]  *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).  If the plaintiff satisfies the prima facie requirement, then the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for their action.  *Id.* The defendant's burden at this stage is one of production, not one of persuasion."  *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000).  If the defendant does so, the plaintiff must either show that race was a determinative factor in the employment decision or that the defendant's non-discriminatory reason was merely pretext.  *See Garrett v. Hewlett-Packard Co.*, 305 F.3d at 1216.

**Legitimate Reason**

Defendants devote the majority of their Memorandum to the second and third steps of the *McDonnell Douglas* analysis, identifying legitimate, non-discriminatory reasons for not renewing

---

[1]To establish a prima facie case of discrimination under Section 1981, a plaintiff "must demonstrate (1) membership in a protected class (2) adverse employment action, and (3) disparate treatment among similarly situated employees."  *Carney v. City and County of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008).

Plaintiffs' contracts and arguing that Plaintiffs cannot show those reasons were pretextual. Defendants point to the testimony of Provost Cruzado who made the final decision to not renew Plaintiffs' contracts. (*See* Cruzado Deposition at 41:16-18). Cruzado based her decision on Chief Audit Executive Brenda Shannon's report, a meeting with Brenda Shannon, meetings with Department Chair Robinson and Associate Dean Olsen, and a memo from Robinson. (*See* Cruzado Deposition at 20:4-22:17, 32:6-16, 33:3-22, 38:3-22, 41:19-42-24). Shannon's report, dated February 11, 2008, stated that "the fact that both [Bird and Moraros] requested reimbursement for the same mileage expense might constitute attempted fraud, assuming the two colluded to be paid twice for the same [approximately $800] expense." (Response Ex. 11).

Robinson's memo, dated February 12, 2008, describes instances of Bird and Moraros' allegedly "unprofessional, unethical, and uncooperative behaviors," including the alleged "attempt to defraud NMSU for approximately $800 in travel money." (Response Ex. 9). Provost Cruzado testified that although she considered the various concerns in Robinson's memo, "it was the attempt to defraud the institution that in my mind was enough cause not to renew this contract." (Cruzado Deposition at 41:19-42:24). Because Defendants have articulated a facially nondiscriminatory reason for not renewing Plaintiffs' contracts, the burden shifts back to Plaintiffs who can survive summary judgment only if they can show that race was a determinative factor in the decision to not renew their contracts, or show that Defendants' explanation for not renewing the contracts was merely pretext.

**Pretext**

To show pretext, a plaintiff must produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for

its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons. " *Argo v. Blue Cross and Blue Shield of Kan., Inc*., 452 F.3d 1193, 1203 (10th Cir.2006).  Plaintiffs would point to isloated, allegedly supported, incidents in support of their pretext claim.  In determining whether plaintiffs have shown pretext, however, the Court considers the evidence in its totality.  *See Orr v. City of Albuquerque*, 531 F.3d 1210, 1215 (10th Cir. 2008).

Robinson submitted a memo to Provost Cruzado "as background material for administration as [Robinson] move[s] forward to serving notices of non-renewal to tenure track faculty members, Drs. Yelena Bird and John Moraros."  (Response Ex. 9).  Robinson's memo states that Bird and Moraros "have exhibited unprofessional, unethical, and uncooperative behaviors since their appointments to tenure track positions in this department."  (*Id.*).  He then briefly describes several instances of their behavior.

In his memo, Robinson stated: "[Bird and Moraros are] known to produce scholarly papers and journal manuscripts, and adding the names of graduate students and faculty members to the author line even though said persons made no contribution to the manuscripts."  (Response Ex. 9).  Plaintiffs argue that Robinson "could not name a single article or name of a faculty member for which this had occurred, casting serious doubt on the bona fides of this as a reason for termination."  (Response at 17) (citing Additional Material Fact 49 and Robinson's deposition transcript).  Plaintiffs misconstrue Robinson's testimony.  Robinson testified that Dean Brandon told him that "[t]hey put his [Brandon's] name on an article that he had nothing to do with."  (Response Ex. 2 at

96:10-14).[2]  Robinson also testified that Michael Young told him that Moraros made a statement to Young to the effect "Here's how we work with our mentors here.  Every time we do a manuscript, we're going to put your name on it."  (Response Ex. 2 at 97:1-9).  Robinson also testified that Bird and Moraros put Professor Buckingham's name on papers that Buckingham did not work on based on Buckingham's inability to answer specific questions that Robinson asked Buckingham about the research.  (*See* Response Ex. 2 at 97:14-98:14).

Robinson's memo also states that "Since August, I have received two written complaints from ICT [computer support] regarding Dr. Moraros' unprofessional behavior while interacting with ICT supervisors and tech workers."  (Response Ex. 9).  Plaintiffs contend that "Robinson admits that he never even spoke with Moraros to find out what happened with regard to the first incident, and considered the second incident 'over' after speaking with Moraros about it, making it unbelievable that Robinson would later base a decision to terminate based on these incidents."  (Response at 17).  Plaintiffs offer no evidence to dispute that Robinson received two written complaints from ICT regarding Moraros' alleged "conduct unbecoming a faculty member."  (Response Ex. 2 at 88:12-95:25).

Robinson's memo indicates that there were "numerous student complaints" regarding a seminar course taught by Moraros.  (*See* Response at 10).  Plaintiffs note that "Moraros received good overall ratings for the [seminar] course on his student evaluations" which were about the same as those received by Robinson's student evaluations.  (Response at 10) (cited portion of Robinson's

---

[2]In their Response, Plaintiffs mistakenly refer to Robinson's deposition transcript as Ex. 4. Robinson's deposition transcript is attached as Ex. 2.  Other exhibits are incorrectly referenced in Plaintiffs' Additional Material Facts.  The citations to exhibits in this Memorandum Opinion and Order refer to the exhibits as they are labeled.

transcript indicates Moraros received one A, three Bs, one C and one F).  Plaintiffs contend that it is "incredible that Robinson based his termination decision on this spurious basis."  (Response at 16).   Review of the cited portion of Robinson's deposition transcript shows that there are two components to instructor evaluations: (1) an overall instructor rating in the form of a letter grade, and (2) student comments.  (*See* Response Ex. 2 at 83:5-84:20).  Robinson's and Moraros' overall letter-grade ratings may have been similar.   However, Robinson's memo refers to the student comments/complaints and Robinson testified that the letter-grade "ratings are less important to me than the comments from the students."  (*See id.*).  Plaintiffs do not dispute that Robinson received numerous student complaints.

Plaintiffs argue that Robinson's reference to Moraros' "alleged ethical breach relating to the Institutional Review Board ("IRB") renewal request" is a pretextual ground for dismissing Moraros because Robinson "testified that it 'wasn't an issue with John [Moraros]' because 'John wasn't part of it.'"  (Response at 10, 16).  Plaintiffs misconstrue the record.  Robinson stated that a student brought him a request for IRB renewal which listed Moraros as the principal investigator, that Moraros was not the student's advisor, and that the student "was not ethically positioned to collect the data."  (Response Ex. 9).   Robinson questioned the student and called the IRB to discuss the matter.  (*See id.*).  Moraros then gave Robinson "a dressing down for interfering with his study."  (*See id.*).  Robinson's testimony indicates that he considered there to be two ethics issues regarding the IRB renewal request, one relating to the student collecting data and the other relating to the reprimand Moraros gave Robinson for not including Moraros in straightening things out.  (*See* Response Ex. 2 at 68:15-76:18).  Robinson's testimony, that "it wasn't an issue with Moraros because Moraros wasn't part of it," referred to the IRB renewal request for data collection.

Robinson testified that the reason for including the IRB renewal issue in his memo was the unprofessional dressing down Moraros gave Robinson, which Robinson characterized as "an unethical breach of protocol." (*Id.*).

Robinson's memo states: "There were a number of matters associated with [Moraros'] withholding approval of expenditures associated with grant projects. Administration had to step in and insist that the dollars be released." (Response Ex. 9). Plaintiffs contend this is a pretextual reason for his decision to not renew Moraros' contract because "Robinson testified that he had not actually investigated this matter prior to using it as justification for termination and that, in fact, Moraros may have been justified in withholding the monies." (Response at 16). Robinson testified that he was not directly involved with the grant fund disbursements, that a vendor had asked about it and another person provided Robinson information which indicated there was an unnecessary delay in the disbursement. (*See* Response Ex. 2 at 86:1-88:11). Plaintiffs do not point to any portions of the record which indicate that Robinson, as Department Chair, had an obligation to personally look into the matter rather than rely on representations by other staff, or that Robinson was aware that the withholding of funds may have been justified.

**Travel Reimbursement Requests**

The dominant reason for the non-renewal of Bird and Moraros' contracts was that both submitted travel reimbursement requests for the same mileage expense. When asked whether any other reasons factored into her decision to approve the nonrenewal of the contracts, Provost Cruzado testified that:

> It was mainly the concern that I had with two young faculty members who so early in their careers had attempted to defraud the institution . . . . The investigation about the attempt to defraud the institution, again, and the conclusions that were reached,

> provided me with the necessary evidence to say this is not the type of faculty
> member that we can have at New Mexico State.

(Mem. Ex. G at 41:16-42:1).  Regarding the other issues mentioned in Robinson's memo, Cruzado

stated:

> I listened to his concerns.  I might have asked questions about more specific details,
> but I want to go back to the point that it was the attempt to defraud the institution
> that in my mind was enough cause not to renew this contract . . . the attempt to
> defraud the institution was a very serious matter.

(Mem. Ex. G at 42:20-24).  Robinson indicated that the incidents described in his memo, other than

the travel reimbursement issue, weren't by themselves grounds for dismissal but collectively with

the travel reimbursement issue led to his decision to recommend nonrenewal.  (*See* Response Ex.

2 at 68:15-70:8, 100:13-101:6).

> Regarding the travel reimbursement issue, Robinson states in his memo that:

> The latest episode, dealt with yesterday, involved charges of an attempt to defraud
> NMSU for approximately $800 in travel money.  [Bird and Moraros] submitted
> travel vouchers to Health Science and the College [of] Agriculture asking
> reimbursement for expenses incurred for their trip back to Las Cruces after their
> leave of absence last fall.  Brenda Shannon's report of the hearing is available.

(Response Ex. 9).

> Bird and Moraros contend that their "submission of dual reimbursement requests was the

result of a mistake on their part, not an attempt to defraud the University."  (Response at 12).  Bird

and Moraros argue that "there was no finding of fraud or misconduct by Bird or Moraros in

connection with the internal audit investigation of the travel reimbursement request."  (Response

at 17).  Although Shannon's audit memo did not find Bird and Moraros attempted to defraud

NMSU, it also did not find that the reimbursement requests for the same mileage expense was the

result of mistake.  (*See* Response Ex. 11).

Shannon's audit memo states that "the fact that both individuals [who are husband and wife] requested reimbursement for the same mileage expense might constitute attempted fraud, assuming the two colluded to be paid twice for the same expense." (Response Ex. 11). Shannon prepared her memo after meeting with both Bird and Moraros. Shannon stated that "Bird was unclear on many details and unsure as to whether she and [Moraros] had discussed the reimbursements, although she did state at one point that she thought he was aware that she had submitted a request through the federal grant account." (*Id.*). Shannon also noted that "Moraros gave us contradictory information, stating at one point that he told [Bird] that 'he would take care of it' in reference to the reimbursement requests, and then later stating that he could not remember if he had actually told her that he had already submitted a request." (*Id.*). Shannon reported that "[i]t seems odd that Drs. Moraros and Bird [who are husband and wife and traveled together in the same car] claimed not to have coordinated their reimbursement requests as they had done on all past trips together." (*Id.*). Shannon's report concluded:

> I . . . told [Bird and Moraros] that Drs. Brandon and Robinson would meet with Human Resources to determine whether any personnel action was appropriate, and that in accordance with state law and university policy, we would notify the State Auditor and the NMSU Police of this matter. As you know, the State Auditor requires notice of any "potential defalcation" in any amount.

(*Id.*).

Provost Cruzado also met with Shannon to discuss the audit report. (*See* Response Ex. 8 at 33:3-34:10). Cruzado and Shannon went through the report "item by item" and discussed the methodology Shannon followed, the persons Shannon interviewed, how Shannon gathered information, her meetings with Moraros and Bird, and Shannon's conclusion about the matter. (*Id.*). Plaintiffs offer no evidence that Cruzado's decision to not renew the contracts, based upon

9

Shannon's audit report and her discussion with Shannon, was pretextual or that race was a determinative factor in Cruzado's decision.  Although not dispositive, it must be noted that Cruzado is Puerto Rican.  (*See* Memorandum at 4).

Plaintiffs also contend that "Robinson recommended termination of Bird's and Moraros' contracts on the basis of alleged misconduct concerning the reimbursement requests before anyone had discussed the basis for the duplicate requests [with Bird and Moraros] and before the University auditor had interviewed them or come to any conclusions about whether University policy was violated."  (Response at 8, 17-18) (pages 17-18 state that Robinson decided to *terminate* contracts before getting Bird's and Moraros' side of the story and before completion of the audit).  Plaintiffs misrepresent the portions of the record they cite to support their contention.  Provost Cruzado testified she met with Robinson more than once "sometime in the earlier part of 2008" to "discuss issues."  (Response Ex. 8 at 20:4-11).  Robinson testified that he met with the provost on February 6th of 2008 "to go over the reprimand letter" regarding the travel reimbursement issue.  (Response Ex. 2 at 127:1-6).[3]  Shannon and Robinson met with Bird and Moraros on February 11, 2008 to discuss the travel reimbursement issue.  (*See* Response Ex. 11).  Shannon completed her audit memorandum regarding the travel reimbursement issue on February 11, 2008.  (*See id.*).  Robinson prepared his notice of nonrenewal, addressed to Provost Cruzado, on February 12, 2008.  (*See* Response Ex. 9).  The record indicates that Shannon completed her audit after she met with Bird and Moraros and that Robinson recommended nonrenewal after Shannon completed her audit.

---

[3]Plaintiffs also cite to page 124 of Robinson's deposition, but did not include that page in Ex. 2).

**Procedural Irregularities**

Plaintiffs contend that pretext can be inferred from procedural irregularities related to their terminations.  (*See* Response at 18-19).  "Disturbing procedural irregularities," such as "deviations from normal company procedure," can constitute evidence of pretext.  *Jaramillo v. Colorado Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005); *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1220 (10th Cir. 2002).  To "establish pretext on a procedural irregularity, a plaintiff must identify an applicable written or unwritten policy or procedure that the employer failed to follow." *Cooper v. Wal-Mart Stores, Inc.*, 2008 WL 4597226 *9 (10th Cir.) (unpublished opinion).  But, "the mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that ... the substantive reasons given by the employer for its employment decision were pretextual." *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007).  "[J]ust because the reasoning relied upon for a certain action is mistaken does not mean that the reason is pretextual."  *Randle v. City of Aurora*, 69 F.3d 441, 455 (10th Cir. 1995).  An "employee's mere allegation that his employer deviated from company policy is insufficient to prove pretext; rather, the employee must present evidence that the employer *believed* that a relevant company policy existed, and chose to deviate from the policy in spite of that belief." *Hysten v. Bulington Northern Santa Fe Railway Co.*, 415 Fed.Appx. 897, 910 (10th Cir. 2011) (*emphasis in original*); *Ronda-Perez v. Banco Bilbao Vizcaya Argentaria--Puerto Rico*, 404 F.3d 42, 47 (1st Cir. 2005) ("the dozen perceived chinks in appellee's reasons for terminating plaintiff let in no light as to any true reason, do not add up to the slightest suggestion of an effort to deceive or cover up a hidden motive").

Plaintiffs contend that NMSU's handling of Bird and Moraros' travel reimbursement was procedurally irregular.  (*See* Response at 18).  They contend that "traditionally any questions

11

concerning travel reimbursements would be handled between the faculty member in question and the department secretary . . . [and if] necessary, the Department Head could become involved." (Response at 18). Plaintiffs contend that Robinson "chose not to follow this established procedure but instead referred the matter to Internal Audit" and that "[n]o one bothered to consult Bird or Moraros to determine if the duplicate submissions were simply a good-faith mistake." (*Id.*). Plaintiffs submit declarations of two NMSU faculty members as evidence of "the procedures *normally* followed in investigating questions concerning travel reimbursements." (*Id.*) (*emphasis added*). Plaintiffs have not submitted any evidence of NMSU policy that requires questions regarding travel reimbursements must be handled with the department secretary, or that the persons submitting the travel reimbursement requests must be consulted, before referring the matter for audit. *See Merritt v. Tellabs Operations, Inc.*, 2007 WL 475834 *5 (10th Cir.) (unpublished opinion) ("[Defendant's] failure to follow the Employee Guidelines . . is not such an irregularity that it constitutes evidence of pretext, because [defendant] was not obligated to follow the Employee Guidelines in every case").

Plaintiffs argue that NMSU's "practice [regarding termination of faculty members] was to give the affected faculty member notice of the problem in an annual evaluation and an opportunity to improve, but this was not done." (Response at 19). Provost Cruzado testified that in September a memo goes out to the faculty with general guidelines regarding annual evaluations typically asking faculty to turn in their documentation before winter holiday, with "annual performance eval[uations] occur[ring] in January, typically." (Response Ex. 7 at 27:20-28:7). Provost Cruzado also stated that "[t]he college never sought to enforce the guidelines, since they were only guidelines." (*Id.*). Plaintiffs offered no evidence that NMSU policy required that they be given an annual evaluation

12

in January.  *See Merritt v. Tellabs Operations, Inc.*, 2007 WL 475834 *5 (10th Cir.) (failure to follow guidelines not evidence of pretext if the defendant was not obligated to follow the guidelines).  Plaintiffs were given notice of their nonrenewals in February.

Plaintiffs also argue that "[b]y policy the Department Head was supposed to 'consult' with senior department faculty before deciding to terminate, but Robinson made his decision before his 'consultation,' making a sham of this requirement."  (Response at 19).  Plaintiffs misconstrue the policy.  The policy does not require department heads to consult with senior faculty "before *deciding* to terminate."  The policy states:  "Although no cause for termination need be given, department heads must consult with senior faculty of the department *before any recommendation of nonrenewal is forwarded to the dean*."  (Response Ex. 3) (*emphasis added*).  Plaintiffs admit, and the record shows, that Robinson complied with the policy and consulted with senior faculty before forwarding his recommendation of nonrenewal.  (*See* Response at 19; Ex. 2 at 132:10-25).  Robinson testified that the policy allows him to recommend nonrenewal even if the consulted faculty members disagree.  (*See* Response Ex. 2 at 133:1-21).  Plaintiffs have not offered any evidence that Robinson's recommendation must be consistent with the consensus of the consulted faculty members.

Plaintiffs argue that "blatant falsification of evidence by Robinson to justify the terminations . . . serves as evidence of pretext."  (*See* Response at 19).  Plaintiffs contend that Robinson provided false information about Bird and Moraros to Provost Cruzado by advising Cruzado that:  (1) Bird and Moraros were known to unethically add names of graduate students and faculty members to scholarly articles to which they did not contribute; (2) Moraros had improperly withheld approval of funds associated with his grant projects; and (3) Moraros was a poor teacher.  (*See id.*).  The

13

Court disagrees.  As discussed above, Plaintiffs misconstrue the record regarding these three issues. Two persons, Brandon and Young, informed Robinson that Plaintiffs had added Brandon's name to an article to which he had not contributed and informed Young that they would add his name to every manuscript they do.  Robinson testified that although he was not directly involved with the grant fund disbursements, a vendor had asked about it and another person provided Robinson information which indicated there was an unnecessary delay in the disbursement.  (*See* Response Ex. 2 at 86:1-88:11).  Plaintiffs argue that "Moraros may have been justified in withholding the monies," and that Robinson "had not actually investigated this matter prior to using it as a justification for termination," but do not dispute Robinson's statements that monies were withheld and administration had to get involved.  (Response at 16).  Robinson did not accuse Moraros of poor teaching but instead informed Cruzado that there were "numerous student complaints" about one course Moraros taught.  Plaintiffs did not dispute Robinson's assertion that there were student complaints.

Plaintiffs argue that they "were entitled to six months' notice [of termination] and the failure to provide them with proper notice is a violation of policy and a serious procedural irregularity." (Response at 19).  There is no dispute that NMSU policy requires that faculty members in their first year of service receive notice "3 months or more before the end date of their contract," while faculty members in their second year receive "6 months or more."  (Response Ex. 3).  Bird and Moraros were given tenure-track faculty positions in the fall of 2007 and notice in February 2008 that their terminations would be effective in May 2008.  Bird and Moraros contend that because they "negotiated a one year credit toward their tenure review date in consequence of their prior faculty service at NMSU," they were entitled to six months notice.  (Response at 19).  Provost Cruzado

14

testified that credit for prior service affects the tenure review date but does not affect the termination notice period which is determined from the "date of effectiveness of their appointments as tenure-track faculty members." (Mem. Ex. G at 65:1-67:3). Plaintiffs have not identified any provision in NMSU's policy that requires credit for prior service be considered when determining termination notice periods.

**More Lenient Treatment of Another Employee**

Plaintiffs also argue that the more lenient treatment of another faculty member shows pretext. (*See* Response at 20-21). Plaintiffs state that at about the time they were terminated, an internal audit determined that another faculty member, a Caucasian, had committed fraud with respect to a reimbursement request. (*See id.*). Plaintiffs also state that they were terminated although "there was no finding of misconduct by Plaintiffs," while the Caucasian faculty member was not terminated. (*Id.*). Plaintiffs claim that because the Caucasian faculty member "was subject to the same policies as Bird and Moraros, the Caucasian faculty member is similarly situated to them and her treatment is therefore relevant." *See Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1177-78 (10th Cir. 2001) (While "in the context of allegations of discriminatory discipline, this court has looked to whether the plaintiff and others with whom he seeks to compare himself worked under the same supervisor," in the context of a facility-wide policy, "the failure of the plaintiff and the other witnesses to share the same supervisor does not preclude the consideration of that evidence").

Plaintiffs have not demonstrated that the more lenient treatment of the Caucasian faculty member establishes that NMSU's and Robinson's reason for not renewing Plaintiffs' contracts, attempted fraud, was pretextual. Plaintiffs state that "the prohibition against fraud is applicable

15

equally" throughout NMSU and that the Caucasian faculty member was "subject to the same policies as Bird and Moraros." (Response at 20).  However, Plaintiffs do not provide a copy of NMSU's disciplinary policy.  (*See* Response Ex. 12) (The Chief Audit Executive's memorandum regarding the allegation regarding the Caucasian faculty member refers to a section of NMSU's Policy Manual titled "Ethics as Related to Misconduct in Scholarship and Research").  The Chief Audit Executive's two memoranda suggest that determination of the appropriate discipline is somewhat discretionary and may depend on the seriousness of the violations.  (*See* Response Ex. 11 regarding Bird and Moraros (noting that the amount in question was approximately $800 and stating the Drs. Brandon and Robinson would meet with Human Resources to determine whether any personnel action was appropriate); Response Ex. 12 regarding the Caucasian faculty member (noting that the amount in question was "minimal" and indicating that the Dean "will consult with the appropriate individuals and determine the appropriate course of action")).  While Plaintiffs have offered evidence that they were disciplined more severely than the Caucasian faculty member, they have not provided evidence of an NMSU-wide disciplinary policy which would require that Plaintiffs and the Caucasian faculty member receive similar disciplinary actions.

**Race-based Comments**

Plaintiffs argue that "Robinson's race-based comments and other evidence that he targeted Bird and Moraros are probative of pretext." (Response at 21).  Their two-sentence argument reads: "There is substantial evidence that Robinson made raced [sic] based-comments about Bird and Moraros and that he targeted them for termination.  Such evidence is also probative of pretext." (*Id.*) (citations omitted).  Plaintiffs cite their Additional Material Facts 14, 15, 17 and 30 to support their argument.

"Discriminatory comments by the decision maker in a Title VII case are properly considered circumstantial evidence of discrimination only where the statements are in fact discriminatory and the plaintiff can demonstrate a nexus between the statements and the challenged employment decision."[4]  *Voltz v. Coca-Cola Enterprises, Inc.*, 91 Fed.Appx. 63, 72 (10th Cir. 2004).  "[I]solated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions."  *Minshall v. McGraw Hill Broadcasting Co., Inc.,* 323 F.3d 1273, 1281 (10th Cir. 2003).  "[A] plaintiff can show such animus by 'demonstrat[ing] a nexus between the allegedly discriminatory statements and the defendant's decision to terminate [the plaintiff].'"  *Id.*  (*quoting Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457 (10th Cir.1994) (holding that "[a] causal nexus can be shown if the allegedly discriminatory comments were directed at the plaintiff, her position, or the defendant's policy which resulted in the adverse action taken against the plaintiff")).  Ambiguous comments may be too abstract to support an inference of discrimination.  *See Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1140 (10th Cir. 2000).

Additional Material Fact 14 cites the testimony of a faculty member Robert Buckingham who stated that Robinson asked him "How many beaners do you have on faculty."  (Response Ex. 4 at 48:22-49:8).  Robinson's question to Buckingham was not directed at the Plaintiffs.  Plaintiffs have not offered any evidence that Robinson's question was made in connection with his decision to recommend nonrenewal of Plaintiffs' contracts.  *See Voltz v. Coca-Cola Enterprises, Inc.*, 91

---

[4]"A plaintiff who alleges discriminatory discharge on the basis of race pursuant to Title VII, 42 U.S.C. § 1983, or § 1981 would have to establish the same elements in order to make out a prima facie case under the McDonnell Douglas burden-shifting analysis."  *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000).

Fed.Appx. 63, 72 (10th Cir. 2004) (comment that was not made in connection with any employment decision is insufficient to raise an inference of discrimination).

Additional Material Fact 15 cites Bird's testimony in which she states Robinson told her "We need to bring in more of our kind into this – into this school.  We need to find a goodness of fit."  (Response Ex. 5 at 67:15-22).  Bird responded "What do you mean by a 'goodness of fit' and 'more of your kind of people' into this department?"  (*Id.*).  According to Bird, Robinson answered "You're smart for a black girl.  You can figure it out."  (*Id.*).  Bird testified that Robinson made those remarks the first time Robinson met her but does not otherwise indicate when Robinson made these remarks.  *See Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457 (10th Cir.1994) (plaintiff did not show a nexus between the comments and her termination where plaintiff did not give enough information for the court to understand the context of the statement or when the statement was made).

Additional Material Fact 17 cites the declaration of NMSU professor Stephen C. Anderson which in relevant part states:

> On several occasions when I was in Olsen's office, Robinson would come in and express his dissatisfaction with Bird and Moraros.  At one time in approximately August 2007 I was in Olsen's office when Robinson came in and was complaining about Bird and Moraros.  He had a file folder in his hand and he waved it in the air and said that this was his file that he was using to gather evidence to use against Bird and Moraros.  He stated that this was not part of their personnel file, but kept in his desk as a resource to get rid off Bird and Moraros.

(Doc. 52-2 ¶ 8 at 3-4, filed February 27, 2009).  The cited portion of Anderson's declaration does not indicate that Robinson used discriminatory language.  Nor does it specify Robinson's dissatisfaction with Bird and Moraros or his complaints about them.  The cited portion of

18

Anderson's declaration is ambiguous in that it is susceptible to more than one interpretation as Robinson could be dissatisfied or complaining for a number of nondiscriminatory reasons.

Additional Material Fact 30 cites a portion of Moraros deposition in which he testified that after the audit meeting with Shannon, Brandon and Robinson, Moraros bumped into Robinson and Robinson said "We got you now." (Response Ex. 1 at 231:15-20). "For a comment to be considered discriminatory, it must, at the very least, relate to the protected class of the plaintiff." *Voltz v. Coca-Cola Enterprises, Inc.*, 91 Fed.Appx. 63, 72 (10th Cir. 2004). Robinson's alleged comment "We got you now" does not relate to either Bird's or Moraros' race.

**Cat's Paw Liability**

Plaintiffs argue that *Staub v. Proctor Hospital*, 131 S.Ct. 1186 (2011), requires denial of NMSU and Robinson's Motion. (*See* Response at 21-22). In *Staub*, the Supreme Court held that "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . ." *Staub*, 131 S.Ct. at 1194. Plaintiffs contend that even though there is no evidence of discriminatory intent on the part of Provost Cruzado, who was the final decision-maker in the terminations of Bird and Moraros, both NMSU and Robinson are liable because "Robinson made the recommendations to terminate, without which Bird and Moraros would not have been fired." (Response at 22). Because the Court is granting summary judgment in favor of Robinson, as discussed in the following section, Plaintiffs argument regarding NMSU's liability under the cat's paw theory set forth in *Staub* must fail.

19

**Racial Discrimination**

Having considered all their evidence in its totality, the Court finds that Plaintiffs have not produced evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in NMSU and Robinson's proffered legitimate reasons for not renewing Plaintiffs' contracts that a reasonable factfinder could rationally find them unworthy of credence and hence infer that NMSU and Robinson did not act for the asserted non-discriminatory reasons.  *See Argo v. Blue Cross and Blue Shield of Kan., Inc*., 452 F.3d 1193, 1203 (10th Cir.2006).

Provost Cruzado determined, after reading Shannon's audit report, discussing the report with Shannon and meeting with Robinson, that Bird and Moraros attempted to defraud NMSU and that such attempt was enough cause to not renew their contracts.  Bird and Moraros admit each of them submitted a travel reimbursement for the mileage expense and, although they claim it was inadvertent, have not offered any evidence that Cruzado's determination, or Robinson's recommendation, are pretextual.

With regard to the other issues in Robinson's memo, the record, specifically Cruzado's testimony, shows that the travel reimbursement issue alone was sufficient to justify non-renewal. Robinson testified that the other issues by themselves were not sufficient to justify non-renewal but included those as backup because those issues collectively with the travel reimbursement issue were sufficient for him to recommend non-renewal.  Even if the other issues were a factor in the non-renewal, Plaintiffs have not shown that those issues were pretextual.  Plaintiffs misconstrue the record concerning the allegation that they added names to scholarly articles, the student complaints about Moraros' seminar class, and the IRB ethics issue.  Plaintiffs do not dispute that Robinson received two written complaints about Moraros from computer support or that administration had

to get involved with Moraros' grant disbursements.  Instead they argue each of these events are not a sufficient basis for termination or that Robinson should have investigated the matter more closely.  As for the alleged procedural irregularities and the "more lenient" treatment of another faculty member, Plaintiffs contend that NMSU and Robinson violated policy or should have acted differently but have not offered any evidence showing specific provisions strictly requiring certain disciplinary conduct with which NMSU and Robinson did not comply.  Finally, Robinson's alleged race-based comments are not sufficient to support an inference that that his recommendation and NMSU's decision to not renew Plaintiffs' contracts were motivated by discriminatory reasons.

The Court will grant summary judgment on Plaintiffs' Section 1981 discrimination claims in favor of NMSU and Robinson.

**First Amendment Retaliation**

Bird and Moraros allege that NMSU and Robinson retaliated against them for their opposition to discrimination and retaliation issues at NMSU by not renewing their employment contracts.  Analysis of freedom of speech retaliation claims is a five-step inquiry.  *See Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1202-03 (10th Cir. 2007).  "First, the court must determine whether the employee speaks pursuant to his official duties," if so, "then there is no constitutional protection because the restriction on speech simply reflects the exercise of employer control over what the employer itself has commissioned or created."  *Id.* at 1202.  "Second, if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern."  *Id.*  "If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends."  *Id.* at 1203.  "Third, if the employee speaks as a citizen on a matter of public concern, the court must determine

whether the employee's interest in commenting on the issue outweighs the interest of the state as employer." *Id.* "Fourth, assuming the employee's interest outweighs that of the employer, the employee must show that his speech was a substantial factor or a motivating factor in a detrimental employment decision." *Id.* "Finally, if the employee establishes that his speech was such a factor, the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech." *Id.* "The first three steps are to be resolved by the district court while the last two are ordinarily for the trier of fact." *Id.*

An "employee must show the protected speech *played a substantial part* in the employer's decision to adversely alter the employee's conditions of employment." *Maestas v. Segura*, 416 F.3d 1182, 1188 (10th Cir. 2005) (*emphasis in original*). "To withstand summary judgment at step three, therefore, an employee must produce evidence linking the employer's action to the employee's speech." *Id.* "Speculation or hunches amidst rumor and innuendo will not suffice." *Id.* at 1189.

> Adverse action in close proximity to protected speech may warrant an inference of retaliatory motive. But temporal proximity is insufficient, without more, to establish such speech as a substantial motivating factor in an adverse employment decision. An employer's knowledge of the protected speech, together with *close* temporal proximity between the speech and challenged action, may be sufficiently probative of causation to withstand summary judgment. Other evidence of causation may include evidence the employer expressed opposition to the employee's speech, or evidence the speech implicated the employer in serious misconduct or wrongdoing. On the other hand, evidence such as a long delay between the employee's speech and challenged conduct or evidence of intervening events tend to undermine any inference of retaliatory motive and weaken the causal link.

*Id.* (*emphasis in original*) (citations omitted).

Plaintiffs argue that they "have provided sufficient evidence that their speech was a motivating factor in their terminations." (Response at 23). Plaintiffs contend that when they spoke out about discrimination on numerous occasions, "Defendants Robinson and Olsen opposed the

Plaintiffs' complaints."  (*Id.*).  However, four of the five Additional Material Facts, Nos. 8, 9, 18 and 20, that Plaintiffs cite to support their contention do not mention Robinson.  The fifth, No. 16, states only that "Due to this inappropriate behavior, Bird and Moraros submitted a complaint to Robinson concerning his and Olsen's behavior on August 17, 2007."  (Response at 5).  None of the five facts cited by Plaintiffs, including the supporting portions of the record, provide evidence that Robinson expressed opposition to Plaintiffs' speech.

Plaintiffs also state that Olsen threatened their continued employment and "made it clear that he [Olsen] expected Robinson to follow his direction to remove individuals he did not like from the Department of Health Science."  (Response at 23).  The facts Plaintiffs cite to support this argument do not show that Olsen actually directed Robinson to remove Bird and Moraros.  *See Alpine Bank v. Hubbell*, 555 F.3d 1097, 1107 (10th Cir. 2009) ("a promise in itself contains no assertion of fact other than the implied representation that the speaker intends to perform the promise").

Plaintiffs also point to Bird's and Moraros' August 2007 memorandum, and to their December 2007 memorandum to Dean Brandon, which "implicated both Robinson and Olsen in serious wrongdoing."  (*Id.*).  Plaintiffs conclude that the "temporal proximity between [December 2007] memorandum, written just 6 weeks to 2 months prior to the terminations, alone establishes causation."  (*Id.*).  Plaintiffs point to their own declarations in which they state that in December 2007 they "composed a [memo] to Dean Brandon in which [they] expressed [their] concerns about discrimination and retaliation on the part of Olsen and Robinson."  (Doc. No. 52-1 ¶ 26 at 7, ¶ 29 at 11).  They did not attach a copy of the December 2007 memo to their Response.  Nothing in the record cited by Plaintiffs indicates that Robinson knew about the December 2007 memorandum.  *See Maestas v. Segura*, 416 F.3d 1182, 1188 (10th Cir. 2005) ("temporal proximity is insufficient,

23

without more, to establish such speech as a substantial motivating factor in an adverse employment decision.  An employer's knowledge of the protected speech, together with close temporal proximity between the speech and challenged action, may be sufficiently probative of causation to withstand summary judgment").  That leaves only the August 2007 memorandum[5] which Bird and Moraros submitted approximately six months before they were notified of the nonrenewal of their contracts.  The long delay between the August 2007 memorandum and the notice of nonrenewal, along with evidence of intervening events, especially the alleged attempt to defraud NMSU, tend to undermine any inference of retaliatory motive and weaken the causal link.

Plaintiffs have failed to present evidence such that a jury reasonably might find a substantial motivating factor in NMSU and Robinson's actions was Bird's and Moraros' protected speech.  The Court will grant summary judgment on Bird and Moraros' First Amendment retaliation claims against NMSU and Robinson in favor of NMSU and Robinson.

**Section 1981 Retaliation**

Bird and Moraros contend that Defendants have not moved for summary judgment on Bird and Moraros' claims that their terminations were the result of retaliation in violation of Title VII, 42 U.S.C. § 1981 or the New Mexico Human Rights Act.  (*See* Response at 1-2).  Defendants do not dispute Bird and Moraros' contention.  (*See* Reply, Doc. No. 406, filed June 3, 2011).  Defendants submitted their Reply "with regard to the contract termination claims of Dr. Yelena Bird and Dr.

---

[5]The Court has previously concluded that the August 2007 memorandum was not protected speech because the allegations in the memorandum focused on the conditions of Bird and Moraros' employment, did not allege that other employees had been subjected to discrimination or retaliation, and did not allege that the discrimination and retaliation interfered with NMSU's performance of its responsibilities.  (*See* Mem. Op. and Order at 5, Doc. 409, filed September 7, 2011).  Because none of the parties addressed the issue of whether the August 2007 memorandum was protected speech in their briefs, the Court will not consider that issue in this Order.

John Moraros premised upon illegal discrimination and First Amendment retaliation," but do not refer to Section 1981 retaliation.  (*Id.* at 1).  The Court will deny Defendants' Motion to the extent that it seeks summary judgment on Bird and Moraros' Section 1981 retaliation claim because his Motion did not address the facts with respect to the relevant legal standard.  *See Murray v. City of Tahlequah*, 312 F.3d 1196, 1200 (10th Cir. 2002) ("Before the burden shifts to the nonmoving party to demonstrate a genuine issue, the moving party must meet its 'initial responsibility' of demonstrating that no genuine issue of material fact exists and that it is entitled to summary judgment as a matter of law").

     **IT IS SO ORDERED.**

**BRUCE D. BLACK**
**CHIEF UNITED STATES DISTRICT JUDGE**