**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

YELENA BIRD, FREEDOM CHETENI,
JOHN MORAROS and SATYA RAO,

          Plaintiffs,

vs.                                    No. CIV 08-851 WJ/RHS

REGENTS OF NEW MEXICO STATE UNIVERSITY,
LARRY OLSEN, in his individual capacity,
JAMES ROBINSON, in his individual capacity,
MICHAEL MARTIN, in his individual capacity,
ROBERT GALLAGHER, in his individual capacity, and
MICHAEL ZIMMERMAN, in his individual capacity,

          Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF CHETENI'S REMAINING CLAIMS

       **THIS MATTER** comes before the Court on Defendants New Mexico State University, James Robinson and Larry Olsen's Motion for Summary Judgment on Plaintiff Cheteni's Remaining Claims (Doc. 457). For the reasons stated below, the Court grants the motion.

### BACKGROUND

       In December, 2013, Plaintiff Cheteni and Defendants Regents of New Mexico State University ("NMSU"), James Robinson and Larry Olsen stipulated that Cheteni's remaining pending claims are as follows:

(1) Against NMSU:

Cheteni, a former graduate student and graduate assistant who was assigned to assist Plaintiff Moraros, brings claims of race discrimination and retaliation pursuant to Title VI, Title VII, Section 1981 and NMHRA against NMSU. Cheteni was subjected to racist conduct and because he opposed discriminatory conduct and filed charges of discrimination and due to his association with Moraros he was subjected to the following acts of discrimination/retaliation: his job as a graduate assistant was threatened and then not renewed; he was berated and ordered to apologize

to department staff for raising discrimination concerns; he was falsely accused of threatening violence; his personal files and papers were searched; a racist and threatening not[e] was put under his office door; he was subjected to retaliatory grading in courses and NMSU refused to process his appeal; he was falsely accused of plagiarism; he was threatened with legal action by a NMSU official; his in-state tuition waiver was revoked on spurious grounds; he was reported to ICE[1] and was arrested and incarcerated for approximately 5 months.

(2) Against Olsen:

Cheteni brings race discrimination claims against Defendant Olsen pursuant to Section 1981 via 42 U.S.C. § 1983.  Defendant Olsen exposed Cheteni to racially derogatory communications, threatened Cheteni's job as a graduate assistant and attempted to secure access to Cheteni's and Moraros' [re]search results.

(3) Against Robinson:

Cheteni brings race discrimination and retaliation claims against Defendant Robinson pursuant to Section 1981 and 42 U.S.C. § 1983.  Defendant Robinson threatened Cheteni's employment as a graduate assistant, refused to renew Cheteni's graduate assistant position for the 2008-9 school year, searched Cheteni's personal files and papers, was hostile [to] Cheteni in the classroom and gave Cheteni undeserved low grades; threatened Cheteni with legal action for asserting his legal rights; and made false charges of academic dishonesty against Cheteni.
(Doc. 443 at 3-4) ("Stipulation").

## LEGAL STANDARDS

Cheteni is asserting racial discrimination and retaliation claims pursuant to Title VI, Title VII, 42 U.S.C. § 1981 and the New Mexico Human Rights Act ("NMHRA").

### Race Discrimination

A plaintiff's discrimination claim, whether brought under Title VII, 42 U.S.C. § 1981, 42 U.S.C. § 1983, or the NMHRA, is subject to the *McDonnell Douglas* burden-shifting framework.  *See Tabor v. Hilti*, 703 F.3d 1206, 1216 (10th Cir. 2013);  *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1226 n.4 (10th Cir. 2000) (noting that the *McDonnell Douglas* burden-shifting analysis applies to discrimination claims brought pursuant to Title VII, § 1983, and § 1981);  *Perry v. Woodward*, 199 F.3d 1126, 1142 (10th Cir. 1999) (applying

---

[1]Immigration and Customs Enforcement.

*McDonnell Douglas* burden shifting analysis to racial discrimination claim brought pursuant to the New Mexico Human Rights Act).  "In racial discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII."  *Carney v. City and County of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008).

Under *McDonnell Douglas*, a plaintiff carries the initial burden of establishing a prima facie case of discrimination.  To state a prima facie case of discrimination, a plaintiff must demonstrate: "(1) that plaintiff belongs to a protected class; (2) that he suffered an adverse employment action; and (3) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination."  *Hysten v. Burlington Northern and Santa Fe Railway Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002).

If a plaintiff states a prima facie case, the burden shifts to the employer to proffer a legitimate non-discriminatory purpose for the adverse employment action.  *See Tabor v. Hilti*, 703 F.3d 1206, 1216-1217 (10th Cir. 2013).  If the employer makes this offering, the plaintiff will avoid summary judgment only if she shows [protected class status] was a determinative factor in the employment decision, or shows the employer's explanation for its action was merely pretext.  *See Tabor v. Hilti*, 703 F.3d 1206, 1217 (10th Cir. 2013).

To prevail on a discrimination claim under Title VI of the Civil Rights Act of 1964, a plaintiff must prove that the defendants engaged in racial discrimination.  *See Baker v. Board of Regents of State of Kan.*, 991 F.2d 628, 631 (10th Cir.1993) ("The two elements for establishing a cause of action pursuant to Title VI are (1) that there is racial or national origin discrimination and (2) the entity engaging in discrimination is receiving federal financial assistance.").  "The elements of a prima facie case are the same under both Title VI and VII."  *Brewer v. Bd. of Trustees of Univ. of IL*, 479 F.3d 908, 921 (7th Cir. 2007).

**Retaliation**

"To establish a prima facie case of retaliation [under Title VII and § 1981], [a plaintiff] must establish that: (1) he engaged in protected opposition to discrimination; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action." *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir.2001). "As with claims for discriminatory discharge, if the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse employment action. If the employer satisfies this burden of production, then, in order to prevail on her retaliation claim, the plaintiff must prove that the employer's articulated reason for the adverse action is pretextual, i.e. unworthy of belief." *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir.2001). "To raise a fact issue of pretext, a plaintiff must present evidence of temporal proximity *plus* circumstantial evidence of retaliatory motive." *E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981, 989 (10th Cir. 2012) (*emphasis* added). a "plaintiff can demonstrate pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's reasons for its action, which a reasonable fact finder could rationally find unworthy of credence." *Id.*

To establish retaliation under Title VI, "a plaintiff must show that: (1) she was engaging in a protected activity; (2) the funded entity subjected her to an adverse action after or contemporaneously with the protected activity; and (3) a causal link between the adverse action and the protected activity." *Whitfield v. Notre Dame Middle School*, 412 Fed.Appx. 517, 522 (3d Cir. 2011).

"In order to establish a claim of retaliation under the NMHRA, a plaintiff must demonstrate that (1) she engaged in protected activity; (2) she suffered an adverse employment

action; and (3) there is a causal connection between these two events." *Charles v. Regents of New Mexico State University*, 256 P.3d 29, 33 (N.M.App. 2010).

## DISCUSSION

Cheteni asserts there are several pending claims against Larry Olsen, James Robinson and NMSU. Several of those claims are overlapping in that Cheteni asserts claims against Olsen and Robinson and also asserts claims against NMSU for the actions of Olsen and Robinson. The Court will discuss each claim against Olsen and Robinson before discussing the claims against NMSU.

## LARRY OLSEN

"Cheteni brings race discrimination claims against Defendant Olsen pursuant to Section 1981 via 42 U.S.C. § 1983." (Stipulation at 4). "Defendant Olsen exposed Cheteni to racially derogatory communications, threatened Cheteni's job as a graduate assistant and attempted to secure access to Cheteni's and Moraros' [re]search results." (Stipulation at 4). Cheteni does not assert any retaliation claims against Olsen in the Stipulation.

**Racially Derogatory Communications**

Cheteni alleges that Olsen exposed Cheteni to two types of racially derogatory communications: (1) emails, and (2) comments about others. During the fall of 2007, one of Cheteni's duties as a graduate assistant to Dr. Moraros was to open and read Moraros' email. (*See* Motion ¶ 5 at 3-4). Cheteni alleges that he "reviewed a number of sexually explicit emails sent to Moraros" by Olsen during the fall 2007 semester, but does not specify how many inappropriate emails Olsen sent. (Response ¶ 11 at 6). Cheteni testified that although he did not "remember the specifics," "some of the e-mails and jokes had both sexual and racial connotations in the same e-mail." (Motion Ex. A at 92:19-93:10). Cheteni also alleges that

during the fall 2007 semester he overheard Olsen making "racist and demeaning comments about Bird and Moraros."  (Response ¶ 12 at 6)(citing Cheteni's Declaration, Doc. 52-3 ¶ 14).  Olsen allegedly "approached Bird and Moraros and questioned them as to their ethnic origin and minority status," "informed Moraros that he could not be Hispanic because his skin was too light and told Bird that she was 'too educated to be black' and didn't sound or dress like a black woman." (Cheteni Declaration ¶ 14 at 3, Doc. 52-3).  Based on the Court's review of the portions of the record cited in the Motion and Response, it appears that Olsen made allegedly racist comments on only one occasion, when Olsen addressed Bird and Moraros.  Cheteni testified that Olsen never made a racial comment to Cheteni.  (*See* Motion Ex. A at 130:4-6).

Cheteni has not made a prima facie showing of adverse employment action based on Olsen's alleged racially derogatory emails and comments.  "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Aquilino v. University of Kansas*, 268 F.3d 930, 934 (10th Cir. 2001) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). "[U]nnecessary derogatory comments are not in themselves materially adverse employment actions." *Wells v. Colorado Dept. of Transp.*, 325 F.3d 1205, 1214 (10th Cir. 2003) (indicating that derogatory comments along with a loss of authority that is prolonged or severe enough may constitute a materially adverse reduction in job responsibilities).

The Court has reviewed the cited portions of the record regarding the alleged derogatory emails and comments.  *See Fowler v. United States*, 647 F.3d 1232, 1237 (10th Cir. 2011) (When determining whether summary judgment is appropriate, the Court "view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the nonmoving party").

While the emails and comments which Cheteni alleges he was exposed to were offensive, they are not, by themselves, sufficiently severe or pervasive to alter the conditions of Cheteni's employment.  Cheteni has not offered any evidence that there was any prolonged or severe reduction in his job responsibilities or adverse change in any other aspect of his employment resulting as a consequence of those emails and comments.

**Threatened Employment**

Cheteni asserts that Olsen threatened Cheteni's job as a graduate assistant.  (*See* Stipulation at 4).  Defendants acknowledge in their Motion that Cheteni alleged in an EEOC charge that he was "threatened with loss of a graduate assistantship if he conducted research for minority faculty members."  (Motion ¶ 5(h) and Ex. B).  Defendants assert that "[t]here is no evidence to support Cheteni's allegation that Dr. Olsen threatened to remove his graduate assistantship if he continued research with Dr. Moraros."  (Motion at 25).

Cheteni appears to have abandoned his claim in the Stipulation that Olsen "threatened Cheteni's job as a graduate assistant."  Cheteni does not offer any material facts citing to the record to support his claim that Olsen threatened his job, does not discuss Olsen's alleged threat in his Response.  Consequently, Cheteni has not stated a prima facie case of discrimination against Olsen based on the alleged threat to Cheteni's employment.

**Attempted Access to Research Results**

In the Stipulation, Cheteni asserted that Olsen "attempted to secure access to Cheteni's and Moraros' [re]search results."  (Stipulation at 4).  Cheteni appears to have also abandoned this claim, because he does not cite to any portions of the record to support this claim and he does not discuss this claim in his Response.  Cheteni has not stated a prima facie case of discrimination against Olsen based on Olsen's attempt to secure access to Cheteni's research results.

**Hostile Work Environment**

Cheteni argues that "Olsen subjected Cheteni to a number of harassing acts of sufficient severity and pervasiveness to constitute a hostile work environment. Cheteni observed a series of emails sent by Olsen which included inflammatory racist content and was involved in conversations in which Olsen directed racially demeaning remarks to his minority colleagues, one of who[m] was also black." (Response at 25).

To survive summary judgment on a claim alleging a racially hostile work environment, Cheteni "must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and that the victim was targeted for harassment because of [his] race or national origin." *Herrera v. Lufkin Industries, Inc.*, 474 F.3d 675, 680 (10th Cir. 2007). The Court "consider[s] the work atmosphere both objectively and subjectively, looking at all the circumstances from the perspective of a reasonable person in the plaintiff's position . . . and may consider the conduct's frequency and severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the plaintiff employee's work performance." *Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008) ("The inquiry is particularly unsuited for summary judgment because it is quintessentially a question of fact.").

Olsen argues that his inappropriate emails and racist remarks do not rise to the level of a hostile racial environment sufficient to sustain a claim under Section 1981. (Motion at 20-21). The Court agrees. Olsen's emails and two remarks over a period of two years, while offensive, by themselves are not sufficiently severe or pervasive to alter the conditions of Cheteni's

employment and create an abusive working environment.  *See Herrera v. Lufkin Industries, Inc.*, 474 F.3d 675, 680 (10th Cir. 2007). ("A plaintiff does not make a showing of a pervasively hostile work environment by demonstrating a few isolated incidents of racial enmity or sporadic racial slurs.  Instead, there must be a steady barrage of opprobrious racial comments.").

**Retaliation**

Cheteni identifies several alleged acts of retaliation and argues that the "immediacy of retaliation following Cheteni's protected activity establish the third prong of the prima facie case against Olsen."  (Response at 21-23).  Those acts include:

> [being] falsely accused of having made a gun threat, receiv[ing] a threatening, racist note warning him to 'go back to Africa,' hav[ing] his in-state tuition status revoked, los[ing] his graduate assistantship, [being] charged with disturbing the peace by a Department administrator, [being] accused of academic misconduct in three separate courses, [being] prohibited from enrolling at NMSU for the spring 2009 semester and [being terminated] in the international student database, resulting in his arrest and subsequent five-month incarceration.

(Response at 22-23).  Cheteni contends that "Olsen was the beginning of all of these actions" and should be held liable for the retaliatory acts.  The Court disagrees for two reasons.

First, there is no pending retaliation claim by Cheteni against Olsen.  The Court previously reviewed the pleadings and rulings in this case and noted that Plaintiffs' complaint "seems like more of a moving target of grievances, rather than a concise but clear assortment of legal theories."  (Doc. 438 at 3).  To remedy "the lack of clarity in Plaintiffs' claims," the Court ordered Cheteni's counsel to prepare a detailed list of Cheteni's claims against each of the Defendants and to include a short description of the specific basis for the claims.  (*See* Doc. 438 at 4).  Cheteni's counsel stipulated that the following accurately states Cheteni's remaining claims against Olsen:

> Cheteni brings race discrimination claims against Defendant Olsen pursuant to Section 1981 via 42 U.S.C. § 1983.  Defendant Olsen exposed Cheteni to racially

> derogatory communications, threatened Cheteni's job as a graduate assistant and
> attempted to secure access to Cheteni's and Moraros' search results.

(Stipulation, Doc. 443 at 4).  The Stipulation does not identify any retaliation claim nor does it include the alleged retaliatory acts for which Cheteni now asserts liability against Olsen.

Second, the Court has already granted summary judgment in favor of Olsen on Cheteni's retaliation claim based on qualified immunity.  (*See* Doc. 369).  In that Memorandum Opinion and Order, the Court noted that the record evidence reflected that a female staff person, not Olsen, accused Cheteni of making a gun threat, and that the racist note was anonymous.  (*See* Doc. 369 at 5).  The Court noted that the remainder of the alleged retaliatory acts occurred after Olsen's employment at NMSU had been terminated and that Cheteni had not set forth any material facts showing that Olsen set in motion the alleged retaliatory acts.  (*See* Doc. 369 at 6).  Cheteni's argument regarding his retaliation claim against Olsen in his Response now before the Court essentially asks the Court to reconsider its previous ruling granting summary judgment in favor of Olsen on qualified immunity grounds.  Cheteni's response, however, does not assert an intervening change in the controlling law, new evidence previously unavailable, or the need to correct clear error or prevent manifest injustice, which would warrant reconsideration of the Court's prior ruling.  *See Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

**Conclusion**

The Court grants summary judgment for Olsen on Cheteni's remaining claims against Olsen because: (1) Olsen's emails and comments, while offensive, were not sufficiently severe or pervasive to alter the conditions of Cheteni's employment; and (2) Cheteni offered no evidence that Olsen threatened Cheteni's job or attempted to secure access to his research results.

## JAMES ROBINSON

"Cheteni brings race discrimination and retaliation claims against Defendant Robinson pursuant to Section 1981 and 42 U.S.C. § 1983." (Stipulation at 4). "Defendant Robinson threatened Cheteni's employment as a graduate assistant, refused to renew Cheteni's graduate assistant position for the 2008-9 school year, searched Cheteni's personal files and papers, was hostile [to] Cheteni in the classroom and gave Cheteni undeserved low grades; threatened Cheteni with legal action for asserting his legal rights; and made false charges of academic dishonesty against Cheteni." (Stipulation at 4).

### Threatened Employment

Cheteni asserted that Robinson threatened his employment as a graduate assistant. (*See* Stipulation at 4). Cheteni filed an EEOC charge, dated June 23, 2008, which states that an NMSU "administrator threatened me with loss of my graduate assistantship" but does not state the date of the threat. (Motion Ex. B). Defendants argue that there is no evidence that Cheteni engaged in protected opposition to discrimination before the alleged threat and, therefore, Cheteni cannot demonstrate the causal nexus required for a retaliation claim. (Motion at 13).

As with Olsen, Cheteni appears to have abandoned his claim that Robinson threatened his job. Defendants state that there are no details regarding Robinson's alleged threat and that "at this late stage of the game, Cheteni has provided no additional specifics regarding alleged threats to his Graduate Assistant position." (Motion at 13). Cheteni does not offer any material facts regarding Robinson's alleged threat and does not discuss Robinson's alleged threat in his Response. Cheteni has not stated a prima facie case of discrimination or retaliation against Robinson based on the alleged threat to Cheteni's employment.

**Refusal to Renew Graduate Assistant Position**

Cheteni asserted that Robinson "refused to renew Cheteni's graduate assistant position for the 2008-9 school year." (Stipulation at 4). Defendants contend that "[t]here is no evidence that either Robinson or Olsen were involved in the assignment of graduate assistant positions by [the time Cheteni lost his graduate assistant position]." (Motion at 13). Cheteni offers no material facts or any argument to support his claim that Robinson "refused to renew Cheteni's graduate assistant position for the 2008-9 school year." The facts and argument Cheteni offers indicate that Department Head Arnold, not Robinson, was involved with the assignment of graduate assistant positions. (*See* Response ¶ 28 at 8, 26). Cheteni has not stated a prima facie case of discrimination or retaliation against Robinson based on Robinson's alleged refusal to renew Cheteni's graduate assistant position. The Court will discuss the non-renewal of Cheteni's graduate assistant position below when it addresses Cheteni's claims against NMSU.

**Search of Personal Files and Papers**

Cheteni asserted that Robinson searched Cheteni's personal files and papers." (Stipulation at 4). Defendants argue that Cheteni "cannot demonstrate that [Robinson's search of Cheteni's personal papers and computer] constituted a material adverse action by Dr. Robinson." (Motion at 19). In his Response, Cheteni cites his own testimony that Robinson was in Cheteni's office going through Cheteni's papers, but does not cite any legal authority showing that searching files is a materially adverse employment action. (*See* Response ¶ 21 at 7, 22). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Aquilino v. University of Kansas*, 268 F.3d 930, 934 (10th Cir. 2001). Cheteni has not demonstrated that Robinson's search of Cheteni's

personal files and papers was an adverse action and, therefore, has not stated a prima facie case

for discrimination or retaliation.

**Hostility in Classroom and Low Grades**

      Cheteni asserted that Robinson was hostile [to] Cheteni in the classroom and gave

Cheteni undeserved low grades." (Stipulation at 4). Robinson taught a class and gave Cheteni a

grade of "D." (*See* Response ¶ 48 at 12). Cheteni contends that Robinson "subjected [Cheteni]

to unfair treatment in the class with regard to Cheteni's assignments and [Robinson] eliminated

the final exam although the syllabus stated that there would be a final exam. This resulted in

disproportionate weight being given to the final paper, upon which Cheteni was given a large

number of specious and unwarranted criticisms." (Response ¶ 48 at 12).

      Defendants argue that there is no record evidence to support Cheteni's claim that

Robinson was hostile to Cheteni in the classroom. (*See* Motion at 20). Cheteni offers no

material facts or argument to show that Robinson was hostile to Cheteni in the classroom.

      With respect to Cheteni's claim that Robinson gave Cheteni a grade of "D," Defendants

set forth the following legitimate non-discriminatory reason for the grade of "D":

> In the Fall 2008 semester, Cheteni enrolled in a Graduate Public Health Seminar
> course taught by Dr. Robinson. Because Cheteni had filed a lawsuit against him,
> Dr. Robinson arranged, after consulting with the acting Dean of the College, to
> have the course's final paper, which was the bulk of the course grade, graded in a
> double blind format by volunteer reviewers from outside NMSU. The remainder
> of the assignments were "pass/fail", whereby full points would be awarded if the
> assignment was completed. . . . Cheteni received a "D" grade for the course.

(Motion ¶¶ 27-28, 34 at 8-9). Cheteni does not dispute these facts offered by Defendants.

      Cheteni offers no facts to show that Robinson's reason for giving Cheteni a "D" is

pretextual. The undisputed facts show that grading system consisted of two parts: (1) the paper,

and (2) the remainder of the assignments. Robinson testified that non-NMSU professors graded

the papers, including Cheteni's, and that those reviewers' scores would be final, because Robinson did not want to be involved in the grade decision. (*See* Motion Ex. D at 278:17-279:5). Cheteni does not offer any evidence that Robinson had any input on the score for Cheteni's paper. Robinson's role regarding the remainder of the assignments was to determine whether the assignments were completed or not and give those assignments a "pass" or "fail" grade. Cheteni has not offered any evidence that Robinson gave Cheteni a "fail" grade for assignments that Cheteni completed.

**Threat of Legal Action**

Cheteni asserted that Robinson threatened Cheteni with legal action for asserting his legal rights." (Stipulation at 4). Defendants contend that there is no record evidence to support Cheteni's claim that Robinson threatened Cheteni with legal action. (*See* Motion at 20). In his Response, Cheteni offers no material facts or any argument to support his claim that Robinson threatened him with legal action.

**False Charge of Academic Dishonesty**

Cheteni asserted that Robinson "made false charges of academic dishonesty against Cheteni." (Stipulation at 4). Defendants offer the following facts as a legitimate reason for Robinson's plagiarism charge against Cheteni:

> Dr. Robinson also submitted all student papers in the course to a commercial website called Turnitin.com, which compares a submitted paper to cited and known sources to assess plagiarism. Upon receiving the reports from Turnitin.com, Dr. Robinson reviewed the papers to determine whether the reports showed actual plagiarism or sloppy citation. Dr. Robinson determined that Cheteni's paper contained significant plagiarism from other sources, which were not referenced or cited by Cheteni as sources. Pursuant to NMSU's Student Code of Conduct regarding academic misconduct, Dr. Robinson put this information in a memorandum to Interim Department Head Dr. Stephen Arnold. The memorandum proceeded up the chain of command to the Interim Dean. Pursuant to the Student Code of Conduct regarding academic misconduct, Graduate Dean

Linda Lacey convened a faculty review committee to investigate the allegation of plagiarism.  Dean Lacey determined that Cheteni had committed plagiarism.

(Motion ¶¶ 29-34 at 8-9).

Cheteni argues that Robinson's reason for charging Cheteni with academic dishonesty is pretextual because "[o]ther students in the same class with higher or approximately the same Turnitin.com report scores were not turned in or prosecuted for plagiarism [while] Robinson determined that all of the hits on the Turnitin.com report for Cheteni were examples of plagiarism while none of the hits on papers of other students, even the student with the higher overall score than Cheteni, were examples of plagiarism."  (Response at 29) (emphasis in original).

Cheteni has not shown that Robinson's reason for charging Cheteni with plagiarism is pretextual.  Robinson testified that he reviewed the Turnitin.com report for each paper and then reviewed each paper to determine whether the statements identified by Turnitin.com were actually plagiarism or just "sloppy scholarship."  (Motion Ex. D at 327:3-328:24).  Robinson concluded statements were plagiarized if they came from other already published sources without any citation to those sources.  (Motion Ex. D at 327:3-328:24; Response Ex. 5).  Robinson characterized statements that came from other sources but which had some, but apparently not the correct, attribution as "sloppy scholarship."  (Motion Ex. D at 327:3-328:24; Response Ex. 5).  Robinson stated that the "other students who had some sections of their papers flagged by Turnitin . . . attributed the material to the published source as indirect quotations [and] did not interpret those papers as plagiarism; rather I see them as reflections of poor scholarship."  (Response Ex. 5).  Cheteni does not offer any evidence that the other students' papers contained statements that came from other already published source without any citation to those sources.

**Conclusion**

The Court grants summary judgment on Cheteni's remaining claims against Robinson in favor of Robinson because: (1) Cheteni offered no facts or argument to support his claims that Robinson threatened Cheteni's employment, refused to renew Cheteni's graduate assistant position, was hostile to Cheteni in the classroom, or threatened Cheteni with legal action; (2) Cheteni has not shown that Robinson's search of Cheteni's files is a materially adverse action; (3) Cheteni has not demonstrated that Robinson's reasons for giving Cheteni a low grade and charging Cheteni with plagiarism were pretextual.

## NMSU REGENTS

Cheteni brings race discrimination and retaliation claims against NMSU pursuant to Title VI, Title VII, 42 U.S.C. § 1981 and the New Mexico Human Rights Act based on the following acts of discrimination and retaliation:  (1) his job was threatened and then not renewed; (2) he was berated and ordered to apologize to department staff; (3) he was falsely accused of threatening violence; (4) his personal files and papers were searched; (5) a racist and threatening note was placed under his office door; (6) he was subjected to retaliatory grading and NMSU refused to process his appeals; (7) he was falsely accused of plagiarism; (8) he was threatened with legal action by a NMSU official; (9) his in-state tuition status was revoked; and (10) he was reported to Immigration and Customs Enforcement.  (*See* Stipulation at 3-4).

**Job Threatened, Not Renewed**

Cheteni brings discrimination and retaliation claims against NMSU stating that "his job as a graduate assistant was threatened and then not renewed." (Stipulation at 3).  During the 2007-2008 school year, Cheteni was employed as a Graduate Assistant in the Department of Health Science and was enrolled in the two-year Master of Public Health ("MPH") program.

(*See* Response ¶ 5 at 4, ¶ 9 at 5).  Cheteni was not given a graduate assistantship for the 2008-

2009 school year.  (*See* Response ¶ 30 at 9).

Defendants offer the following material facts regarding the nonrenewal of Cheteni's

graduate assistantship:

> In 2008, Graduate Assistant positions were reserved for majors in the College of
> Health and Social Services.  In early July 2008, Dr. Arnold pulled up Cheteni's
> class registration for the upcoming semester and determined that Cheteni was
> only enrolled in a Doctor of Economic Development program in the College of
> Business.  He was not registered for any classes within the College of Health and
> Social Services.  Cheteni eventually registered for public health courses and
> dropped the economic development courses; however, by this time all the
> Graduate Assistantships had already been assigned to other students in the
> college.  In July 2008, Dr. Stephen Arnold, who was acting as interim Department
> Head, received an email from Plaintiff Cheteni asking whether he would be
> receiving a Graduate Assistant position for the upcoming fall semester.  Dr.
> Arnold informed Cheteni that he had not received a Graduate Assistant position
> because he was no longer a designated major in the College of Health and Social
> Services.

(Motion ¶¶ 23, 25-26 at 7-8).

Cheteni offers two arguments to demonstrate that Arnold's reason for not awarding

Cheteni a graduate assistantship is pretextual.  First, Cheteni states that "In April 2008, Luis

Vazquez, interim Department Head of Health Science, telephoned Cheteni and inquired whether

Cheteni intended to continue his studies in the MPH program.  Cheteni assured Vazquez that he

intended to pursue studies both in the MPH program and in Economics."  (Response ¶ 27 at 8)

(the Response cites an answer to an interrogatory which indicates Cheteni called Dr. Vazquez in

mid-June 2008).  Second, Cheteni argues that because Arnold wrote to the dean on July 29,

2008, seeking to permanently remove Cheteni from the MPH program, Arnold's reason for not

awarding Cheteni a graduate assistantship – "that Cheteni was no longer a student in the

Department of Health Science" -- was "bogus," because a request to remove a student from a

program "would not be necessary if he were already a student in another department."
(Response ¶ 30 at 9, 23-24).

Cheteni has not demonstrated that Arnold's reason for not awarding Cheteni a graduate assistantship is pretextual.  It is not disputed that graduate assistantships were reserved for majors in the College of Health and Social Services and that when making the graduate assistantship assignments Arnold checked to see the courses in which Cheteni was enrolled.  (*See* Motion Ex. J at 94:8-99:8).  Nor is it disputed that when Arnold checked Cheteni's class registration for the fall 2008 semester Cheteni was only enrolled in classes in the College of Business, was not registered for any classes in the College of Health and Social Services, and not until after the graduate assistantships had been assigned did Cheteni register for courses in the College of Health and Social Services.  (*See* Motion Ex. J at 94:8-99:8).  Cheteni offers no evidence that Vazquez had any role in the assignment of graduate assistantships or that Vazquez informed Arnold that Cheteni intended to pursue an MPH major in the fall 2008.

Arnold's memo of July 29, 2008 to the dean does not demonstrate that Arnold's reason for not awarding Cheteni a graduate assistantship is pretextual. Arnold sent the memo after he received an email from Cheteni informing Arnold that Cheteni remains in the MPH program and will be taking courses for the MPH degree in the fall 2008.  (*See* Doc. 363-3, filed February 14, 2011).  Cheteni sent the email after Arnold had awarded the graduate assistantships and after Arnold informed Cheteni that Cheteni would not be receiving a graduate assistantship.  Cheteni's email and Arnold's memo, both sent after Arnold awarded the graduate assistantships, does not show that Arnold knew, when he awarded the assistantships, that Cheteni planned to remain in the MPH program and take MPH courses in the fall 2008.  The record evidence offered shows that Arnold made his decision to not award Cheteni an assistantship after reviewing Cheteni's

fall 2008 registration which showed only courses in the College of Business and no MPH

courses.  Cheteni has not shown that Arnold's reason for not awarding Cheteni an assistantship is

pretextual.

**Berated and Ordered to Apologize**

Cheteni brings discrimination and retaliation claims against NMSU stating that "he was

berated and ordered to apologize to department staff for raising discrimination concerns."

(Stipulation at 3).  In the fall of 2007, Cheteni requested a computer and there was a delay before

it was delivered.  (*See* Motion ¶ 12 at 5).  Cheteni allegedly made a comment that "the delay in

obtaining his computer was race-based discrimination" which allegedly "upset both Dr.

Robinson and a staff member."  (Motion at 16).  Robinson testified that he told Cheteni: "It

would be a nice gesture on your part if you would go back and apologize to [the staff member]."

(Motion Ex. D at 269:24-270:1).  Cheteni testified that Robinson "berated me and told me that

I'd misbehaved by even mentioning discrimination, and he ordered me to go down and apologize

to Jane and Nancy."  (Response Ex. 1 at 233:22-24).

Defendants argue that even if "Robinson berated [Cheteni] and ordered him to apologize

to staff for accusations of discrimination, this does not constitute a materially adverse

employment action."  (Motion at 16).  In his Response, Cheteni does not address whether

Robinson's alleged berating and order to apologize constitute an adverse employment action.

The Court agrees with Defendants that Robinson's alleged actions do not constitute an adverse

employment action.  *See Hoko v. Huish Detergents, Inc.*, 453 Fed.Appx. 799, 802-803 (10th Cir.

2011) (being yelled at did not rise to the level of an adverse employment action).

**Falsely Accused of Threatening Violence**

Cheteni brings discrimination and retaliation claims against NMSU stating that "he was falsely accused of threatening violence." (Stipulation at 3-4). According to Cheteni, "[i]n late February 2008 a rumor spread through NMSU from administration that Cheteni had made a gun threat. He made no such threat and the Dean later conceded there had been no threat to safety." (Response ¶ 20 at 7).

Defendants assert that Cheteni "was never arrested or even interviewed by the police; the suspicion that he made a threat of violence was not the basis for any employment or other decision, and did not result in suspension or any other penalty." (Motion at 17). Defendants argue that Cheteni's claims based on the alleged accusation fails because the accusation does not constitute an adverse action. Defendants further argue that even if Cheteni could establish a prima facie case of discrimination on the accusation, NMSU had a legitimate, non-discriminatory reason for believing Cheteni made such a threat, because a staff member informed NMSU administrators that such a threat had been made. (Motion at 17-18).

"Filing false criminal charges against . . . an employee can constitute an adverse employment action." *Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1269 (10th Cir. 2005). There is no adverse employment action, however, where a false complaint results in a police report but no formal charges, and there is no evidence that the matter persisted beyond the filing of the report. *See id.* The record evidence shows that Cheteni was not arrested or interviewed by the police. Cheteni does not argue that the accusation that he threatened violence is an adverse action. Nor does he offer any evidence that the matter persisted to the point that it "carr[ied] a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects." *Dick v. Phone Directories Co., Inc.*, 397 F.3d at 1269. Accordingly,

Cheteni has not made a prima facie case of discrimination or retaliation because he has not

shown that the false accusation was an adverse action.

**Personal Files Searched**

Cheteni brings discrimination and retaliation claims against NMSU stating that "his

personal files and papers were searched." (Stipulation at 4). These claims are based on

Cheteni's allegation that Robinson was in Cheteni's office going through Cheteni's papers. The

Court has determined earlier in this Opinion that such a search is not an adverse action.

**Racist Note**

Cheteni brings discrimination and retaliation claims against NMSU stating that "a racist

and threatening not[e] was put under his office door." (Stipulation at 4). According to Cheteni,

"[o]n the morning of April 14, 2008, a Monday, when Cheteni went into his office at NMSU he

found an anonymous note under his office door stating: 'ni**er shut the f**k! up and get out of

las cruces and NMSU and go back to Africa asap or else.'" (Response ¶ 23 at 8).

Defendants assert that the note was investigated by the NMSU Police Department and by

the FBI's Civil Rights Division. (Motion ¶ 19 at 6). An officer with the NMSU Police

Department testified that there has not been any determination of who wrote the note. (Motion

¶ 19 at 6, Ex. F at 12:9-16). Defendants argue that there is no evidence that an NMSU employee

was responsible for placing the note under Cheteni's door and that such a note is not a materially

adverse action.

Cheteni does not cite to any portions of the record to show that an NMSU employee was

responsible for placing the note under Cheteni's door and makes no argument that such a note is

an adverse employment action.

**Retaliatory Grading/Appeal Refused**

Cheteni brings discrimination and retaliation claims against NMSU stating that "he was subjected to retaliatory grading in courses and NMSU refused to process his appeal." (Stipulation at 4). There were three incidents of alleged retaliatory grading: (1) by Robinson who gave Cheteni a "D" above; (2) by Dr. Michael Young who gave Cheteni an "F"; and (3) by Dr. Sue Forster-Cox who gave Cheteni a failing grade. (*See* Motion ¶¶ 34-37 at 9-10). The Court discussed the alleged retaliatory grading by Robinson earlier in this opinion and will not repeat it here.

Defendants assert the following material facts regarding the alleged retaliatory grading by Dr. Michael Young:

> Also in the Fall 2008 semester, Cheteni was enrolled in a Master of Public Health course taught by Dr. Michael Young. Dr. Young gave Cheteni an "F" for the course. Cheteni sent an email to Dr. Young expressing his desire to appeal this grade; Dr. Young responded to his email explaining his reasoning for the grade and reiterating the process for appeals. Cheteni did not pursue the grade appeal further.

(Motion ¶ 35 at 9-10). In his email, Young explained how he determined Cheteni's grade. First, Young summarized Cheteni's scores on the final exam, the midterm exam, a poster presentation, a research proposal and participation which would have given Cheteni a "C." (*See* Motion Ex. M). Young noted that Cheteni "for almost every class meeting [Cheteni] arrived late and left early, did not attend four class meetings, and there was a fifth for which he only attended the first half of the class. (*See* Motion Ex. M). Because the course syllabus indicates that students with more than two absences will have their grade reduced one letter grade, Cheteni's grade was lowered to a "D." (*See* Motion Ex. M). Young imposed an additional penalty of one letter grade, giving Cheteni an "F" for the course, because the paper Cheteni submitted to Young was

"identical, word for word," to a paper that Cheteni submitted in another class.  (*See* Motion Ex. M).

Cheteni disputes Young's explanation of his grade and cites to Cheteni's Declaration to support his contention that he did not miss four classes.  (*See* Response ¶ 47 at 12). Cheteni admits that he "only missed two classes" but does not address how much class time he missed by arriving late and leaving early.  (Cheteni Declaration ¶ 19 at 6, Doc. 25-1, filed February 5, 2009).  Cheteni also contends that "other students submitted papers in the class on topics similar to those on which they submitted papers for other classes, but they did not receive reduced grades."  (Cheteni Declaration ¶ 19 at 6, Doc. 25-1, filed February 5, 2009).  While he points out that other students submitted papers on *topics similar to those* on which they submitted papers for other classes, Cheteni has not offered any evidence of students that had submitted papers that were "identical, word for word," in two classes and were not penalized.  Cheteni has not shown that Young's reason for giving Cheteni an "F" is pretextual.

Cheteni received an "F" in a Field Experience course taught by Dr. Sue Forster-Cox. Completion of the Field Experience class requires 160 hours of filed work in a health-related endeavor.  (*See* Cheteni Declaration ¶ 15 at 5, Doc. 25-1, filed February 5, 2009).  According to Forster-Cox, "the basis of [the Field Experience course] is the execution of the established goals and objectives which [Cheteni] developed [and were reviewed by Forster-Cox] to ensure that they were in line with the responsibilities for a health educator;" those goals and objectives were finalized on September 3, 2008." (Memo from Forster-Cox to Cheteni re: Grade Appeal, Ex. 2.13, Doc. 25-1 at 29-31, filed February 5, 2009).  A large portion of the grade is based on the notebook the student submits which provides a daily log and a presentation of materials developed in line with the established goals and objectives.  The daily log must show, for every

day that the student works: "1) what occurred that day; 2) what they accomplished or learned; 3) challenges or obstacles they were involved with; 4) people they met with and/or meeting attended and purpose of the meetings; and 5) hours worked each day."  (Memo from Forster-Cox to Cheteni re: Grade Appeal, Ex. 2.13, Doc. 25-1 at 29-31, filed February 5, 2009).  Forster-Cox testified that she gave Cheteni an "F" because his notebook did not provide a daily log or "any documentation of how he had spent his 160 hours and did not provide any documentation of having developed or implemented a health-education presentation."  (Motion Ex. N at 53:20-25).

Cheteni responds that he "completed all requirements for his Field Experience class and sought timely approval for a change of location and supervisor."  (Response at 4).  To support his response, Cheteni cites his Declaration of February 5, 2009, in which he states "I submitted to Ms. Forster-Cox a binder which included a daily log covering the filed experience work I had fulfilled during the summer of 2008, the subject and content of my class presentation."  (Doc. 25-1 ¶ 17 at 6).  Cheteni concludes that "In the Field Experience class Cheteni was given an F because he allegedly changed locations and supervisors without communicating with [Forster-Cox] and did not complete all of the required course work"  (Response at 30).

Defendants have offered a legitimate, nondiscriminatory reason for awarding Cheteni an "F" in the Field Experience course.  Cheteni and Forster-Cox agreed, on September 3, 2008, on the goals and objectives Cheteni was to execute during the Fall 2008.  Defendants assert that Forster-Cox gave Cheteni an "F" because he did not, among other things, submit a daily log of his activities for the Fall 2008.  Although Cheteni asserts that he "completed all requirements" for the Field Experience class and submitted a daily log, he admits that he completed the requirements "during the summer of 2008" prior to Forster-Cox' approval of Cheteni's goals and objectives.  Cheteni does not contend that he submitted a daily log for any work performed

during the Fall 2008.  Cheteni also asserts that he "sought timely approval for a change of

location and supervisor," and stated in his Declaration that "I am not aware of any expressed

deadline for communicating with a professor seeking approval for a change in location for field

experience."  (Doc. 25-1 ¶ 17 at 6).  There is no dispute that Cheteni did not submit a daily log

for Fall 2008.  Cheteni's argument that he sought timely approval for a change of location and

supervisor is not persuasive because he has not shown that such approval was granted or should

have been granted.  Cheteni, consequently, has not shown that Defendants' reason for awarding

him an "F" in the Field Experience course is pretext.

Defendants argue that "there is no evidence to suggest [Cheteni] properly pursued any

grade appeals that were 'refused.'"  (Motion at 15).  Robinson testified that he did not "recall

ever seeing any paperwork on a grade appeal."  (Motion Ex. D at 348:15-16).  After Cheteni

emailed a "grade appeal" to him, Young responded with a "grade review" via email explaining

how he determined Cheteni's grade.  (*See* Motion Ex. M).  Young testified that he was not

informed if Cheteni pursued the grade appeal to a higher level and that he expected to be

informed if Cheteni had pursued the appeal to a higher level.  (*See* Motion Ex. L at 134:14-34).

Forster-Cox similarly provided Cheteni with an explanation of how she determined his grade.

(Memo from Forster-Cox to Cheteni re: Grade Appeal, Ex. 2.13, Doc. 25-1 at 29-31, filed

February 5, 2009).

In a one-sentence argument, Cheteni states that he "appealed his grades in these courses,

but no final determination of the grade appeals was ever rendered," and cites to an earlier portion

of his Response.  (Response at 30).  That earlier portion of his Response states "Cheteni appealed

the grades assigned to him by Robinson, Young and Forster-Cox for the fall 2008 semester," and

cites to Cheteni's Declaration.  (Response at 3).  The cited portion of Cheteni's Declaration

states "I am in the process of appealing my fall 2008 grades.  My appeals have been denied so far, but are not concluded."  (Doc. 25-1 ¶ 25 at 9).  Cheteni does not cite to any portions of the record to show that he pursued his grade appeals and that NMSU "refused" to consider them.

**Accused of Plagiarism**

Cheteni brings discrimination and retaliation claims against NMSU stating that "he was falsely accused of plagiarism."  (Stipulation at 4).  These claims are based on Cheteni's allegation that Robinson made false charges of plagiarism.  The Court has determined earlier in this Opinion that Cheteni has not demonstrated that Robinson's reason for accusing Cheteni of plagiarism is pretextual.

**Threat of Legal Action**

Cheteni brings discrimination and retaliation claims against NMSU stating that "he was threatened with legal action by a NMSU official."  (Stipulation at 4).

Defendants offered the following material facts:

In April 2008, Cheteni began sending emails to Dr. DeLeon, the Associate Provost regarding a request to have failing grades changed to a retroactive withdrawal.  Cheteni also submitted an email to several officials at the University of New Mexico, where Dr. DeLeon was seeking employment, accusing her of discrimination, retaliation and other offenses.  Dr. DeLeon retained a private attorney who sent a letter to Cheteni demanding that he cease all defamatory communication about her.

(Motion ¶¶ 20-21 at 7).  Defendants assert that "Dr. DeLeon did not take any action in her capacity as an NMSU official, and NMSU did not take any action on behalf of Dr. DeLeon in this regard."  (Motion at 18).  Defendants conclude that "NMSU cannot be said to have engaged in any action, much less a materially adverse action.  (Motion at 18).

Cheteni offers the following material facts:

On or about February 21, 2008 Cheteni filed a discrimination and retaliation complaint with Assistant Provost DeLeon.  When Cheteni expressed criticism

about the way she handled his complaint, DeLeon engaged an attorney and
threatened to file suit against Cheteni.

(Response ¶¶ 13-14 at 6).   Cheteni does not dispute the material facts offered by Defendants

regarding Dr. DeLeon and does not present any argument to support his discrimination and

retaliation claims against NMSU based on the alleged threat of legal action by an NMSU official.

**In-State Tuition Revocation and Report to ICE**

Cheteni brings discrimination and retaliation claims against NMSU stating that "his in-

state tuition waiver was revoked on spurious grounds," and that "he was reported to ICE and was

arrested and incarcerated for approximately 5 months."  (Stipulation at 4).  Cheteni alleges that

the NMSU Registrar, Defendant Michael Zimmerman, revoked Cheteni's in-state tuition and

wrote a letter to ICE advising them that Cheteni was not registered for the Spring 2009 semester.

(*See* Response¶ 34 at 9,  ¶ 52 at 13).

Cheteni had alleged that Zimmerman denied Cheteni in-state tuition and contacted ICE

for discriminatory and retaliatory reasons in violation of 42 U.S.C. § 1981.  (*See* Fourth

Amended Complaint ¶¶ 92, 95, 158 and 167).  The Court granted Zimmerman's motion for

summary judgment based on qualified immunity after finding that "Cheteni ha[d] produced no

specific evidence that Zimmerman was substantially motivated by a desire to discriminate or

retaliate against Cheteni."  (Mem. Op. and Order at 9, 12, Doc. 437, filed November 20, 2012).

Defendants state that since "there is no *respondeat superior* liability under § 1981 or

[§] 1983, [Cheteni's] claims against NMSU were extinguished when Zimmerman was granted

qualified immunity."  (Motion at 12).

Cheteni asserts that the Regents of New Mexico State University should be liable for

Zimmerman's actions in revoking Cheteni's in-state tuition and reporting Cheteni to ICE.

Cheteni states:

> The Court has previously ruled with regard to Zimmerman's qualified immunity as it relates to revocation of Cheteni's in-state tuition status. However, as noted above, that ruling is as to Zimmerman only, is in the context of qualified immunity, and is not binding in the context of NMSU's liability.

(Response at 28). Cheteni also states that the Court's ruling regarding Zimmerman's qualified immunity "has limited applicability" to NMSU's liability. (Response at 30).

The "Civil Rights Act of 1991 create[d] an implied cause of action against state actors under 42 U.S.C. § 1981." *Federation of African American Contractors v. City of Oakland*, 96 F.3d 1204, 1215 (9th Cir. 1996). Section 1981 does not, however, "impose respondeat superior liability on state actors." (*Id.* at 1215-16). A plaintiff suing a state actor under 42 U.S.C. § 1981 must establish that his rights were violated as a result of the state actor's "policy or custom." (*Id.*).

Cheteni has not established that his rights were violated as a result of NMSU's policy or custom. The decision whether to grant asylum petitioners, such as Cheteni, in-state tuition is based on professional judgment with interpretation of residency policies of the state of New Mexico. (*See* Mem. Op. and Order at 3-5, Doc. 437, filed November 20, 2012) (quoting requirements for in-state tuition classification in the New Mexico Administrative Code). In addition, NMSU has granted asylum petitioners with in-state tuition only two or three times. (*See id.* at 5). As for Zimmerman reporting Cheteni's enrollment status to ICE, federal law requires NMSU to report registration information of foreign students such as Cheteni no later than 30 days after the deadline for registering for classes. (*See id.* at 10) (quoting the Code of Federal Regulations). Furthermore, Zimmerman reported Cheteni's enrollment status at the request of an ICE officer. (*See id.*). Cheteni cites no evidence and makes no argument that NMSU's policies or customs regarding tuition status or reporting enrollment status to ICE violated his rights.

**Academic Misconduct Complaint**

Cheteni alleges that "Arnold filed a complaint against Cheteni with Student Judicial Services seeking to have Cheteni removed from NMSU." (Response ¶¶ 32 at 9). Cheteni argues that "Student Judicial Services has the power to discipline students, including banning them from campus. Had this occurred in Cheteni's case, it would effectively have ended his academic career at NMSU." (Response at 20). Student Judicial Services did not discipline Cheteni and instead dismissed the charges in a letter to Cheteni which stated:

> This letter will serve to document my decision regarding your alleged involvement in an incident that occurred on September 3, 2008. In concluding my investigation, I have been unable to reasonably determine your culpability in this reported incident. Therefore, the charges as outlined in my letter are being dismissed.

(Doc. 25-1 at 27). NMSU did not address Arnold's misconduct charge against Cheteni in its motion.

Cheteni contends that NMSU should be held liable to Cheteni for the misconduct charges filed by Arnold. (Response at 18). The Court will not do so. The Court ordered Cheteni to prepare a detailed list of his claims against NMSU and for each claim listed to "include a short description of the specific basis for the claim." (Doc. 438 at 4, filed November 21, 2012). Cheteni filed a stipulated list of his claims against NMSU along with a list of the actions that provided the specific bases for those claims. Cheteni did not include Arnold's misconduct charge in his list of acts of discrimination and retaliation that form the basis of his claims against NMSU. (*See* Doc. 443 at 3-4, filed December 13, 2012).

**Conclusion**

The Court grants summary judgment on Cheteni's remaining claims against NMSU in favor of NMSU because: (1) for his claims regarding nonrenewal of his job, course grades and

the plagiarism accusation, Cheteni has not demonstrated the NMSU's reasons for its actions were pretextual; (2) for his claims regarding being berated, having his files searched and being accused of threatening violence, Cheteni has not shown that NMSU's actions were materially adverse; (3) for his claims regarding the racist note and the threatened legal action, Cheteni has not offered any evidence of NMSU's involvement in those incidents; and (4) regarding the revocation of his in-state tuition status and being reported to ICE, Cheteni has not established that his rights were violated as a result of NMSU's policy or custom.

**SO ORDERED.**

_____
**UNITED STATES DISTRICT JUDGE**