IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

YELENA BIRD, FREEDOM CHETENI,
JOHN MORAROS and SATYA RAO,

                    Plaintiffs,

vs.                                                                   No. CIV 08-851 WJ/RHS

REGENTS OF NEW MEXICO STATE UNIVERSITY,
LARRY OLSEN, in his individual capacity,
JAMES ROBINSON, in his individual capacity,
MICHAEL MARTIN, in his individual capacity,
ROBERT GALLAGHER, in his individual capacity, and
MICHAEL ZIMMERMAN, in his individual capacity,

                    Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE REMAINING
CLAIMS OF PLAINTIFFS BIRD AND MORAROS**

**THIS MATTER** comes before the Court on Defendants Larry Olsen, James Robinson and the Regents of New Mexico State University, James Robinson and Larry Olsen's Motion for Summary Judgment on the Remaining Claims of Plaintiffs Bird and Moraros (Doc. 455). For the reasons stated below, the Court grants the motion in part.

### BACKGROUND

In December, 2013, Plaintiffs Yelena Bird and John Moraros and Defendants Regents of New Mexico State University ("NMSU"), James Robinson and Larry Olsen stipulated that Bird's remaining pending claims are as follows:

(1) Against NMSU:

    Bird, a former faculty member, brings claims of retaliation pursuant to Title VI of
    the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.* ("Title VI")(prohibiting
    discrimination/retaliation in educational programs receiving federal financial

    assistance), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, *et seq.* and 2000e *et seq.* (Title VII), 42 U.S.C. § 1981 ("Section 1981"), and the New Mexico Human Rights Act, § 28-1-1 *et seq.* NMSA 1978 ("NMHRA") against NMSU. Bird opposed conduct she believed to be unlawfully discriminatory on the basis of race and filed charges of discrimination and in retaliation NMSU, through Defendants Olsen and Robinson, caused an audit investigation into duplicate expense reimbursement requests to be initiated, drafted a memorandum containing false allegations regarding Bird and her husband Moraros, and initiated proceedings to terminate Bird's employment as a faculty member. The termination proceedings ultimately resulted in Bird's termination. Following Bird's termination NMSU personnel made false allegations of plagiarism against Bird, threatened to revoke her Ph.D. degree granted by NMSU because NMSU claimed Bird had falsely represented to NMSU when she matriculated that she possessed a M.D. degree from a university in Mexico, and rescinded her admission to NMSU's School of Social Work, where she would have been able to continue her scholarly work.

(2) Against Olsen:

    Bird asserts a retaliation claim against Defendant Olsen pursuant to Section 1981 and 42 U.S.C. § 1983. Bird opposed adverse conduct on the basis of race and because of that Defendant Olsen participated in depriving Bird of the opportunity to teach classes she had been promised and initiated an audit investigation into duplicate travel expense reimbursement requests that ordinarily would have been handled without controversy within the department. The audit investigation was one of the factors upon which Bird's termination was based.

(3) Against Robinson:

    Bird asserts a retaliation claim against Defendant Robinson pursuant to Section 1981 and 42 U.S.C. § 1983. Bird opposed adverse conduct on the basis of race and because of that Defendant Robinson participated in depriving Bird of the opportunity to teach classes she had been promised, helped to initiate an audit investigation into duplicate travel expense reimbursement requests that ordinarily would have been handled without controversy within the department, initiated termination proceedings, participated in an investigation into baseless allegations that Bird plagiarized in her master's thesis, participated in threats to revoke Bird's Ph.D. degree based on the spurious claim that she had misrepresented the conferral of an M.D. degree and participated in revocation of admission of Bird to NMSU's School of Social Work.

(Doc. 443 at 1-3) ("Stipulation"). The parties stipulated that Moraros' remaining claims are as

follows:

(1) Against NMSU:

2

  Moraros, a former faculty member, brings claims of retaliation pursuant to Title VI, Title VII Section 1981 and the NMHRA against NMSU. Moraros opposed conduct he believed to be unlawfully discriminatory on the basis of race and filed charges of discrimination and in retaliation NMSU, through Defendants Olsen and Robinson, caused an audit investigation into duplicate expense reimbursement requests to be initiated, drafted a memorandum containing false allegations regarding Moraros and his wife Bird, and initiated proceedings to terminate Moraros's employment as a faculty member. The termination proceedings ultimately resulted in [Moraros'] termination. Following Moraros's termination NMSU personnel made false allegations of plagiarism against Moraros, threatened to revoke his Ph.D. degree granted by NMSU because NMSU claimed Moraros had falsely represented to NMSU when he matriculated that he possessed a M.D. degree from a university in Mexico, and rescinded his admission to NMSU's School of Social Work, where he would have been able to continue his scholarly work.

(2) Against Olsen:

  Moraros asserts a retaliation claim against Defendant Olsen pursuant to Section 1981 and 42 U.S.C. § 1983. Moraros opposed adverse conduct on the basis of race and because of that Defendant Olsen participated in depriving Moraros of the opportunity to teach classes he had been promised and initiated an audit investigation into duplicate travel expense reimbursement requests that ordinarily would have been handled without controversy within the department. The audit investigation was one of the factors upon which Moraros's termination was based.

(3) Against Robinson:

  Moraros asserts a retaliation claim against Defendant Robinson pursuant to Section 1981 and 42 U.S.C. § 1983. Moraros opposed adverse conduct on the basis of race and because of that Defendant Robinson participated in depriving Moraros of the opportunity to teach classes he had been promised, initiated an audit investigation into duplicate travel expense reimbursement requests that ordinarily would have been handled without controversy within the department, initiated termination proceedings, participated in threats to revoke Moraros's Ph.D. degree based on the spurious claim that he had misrepresented the conferral of an M.D. degree and participated in revocation of admission of Moraros to NMSU's School of Social Work.

(Stipulation at 4-6).

## RETALIATION LEGAL STANDARD

  "To establish a prima facie case of retaliation [under Title VII and § 1981], [a plaintiff] must establish that: (1) he engaged in protected opposition to discrimination; (2) he suffered an adverse

employment action; and (3) there is a causal connection between the protected activity and the adverse employment action." *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir.2001). "As with claims for discriminatory discharge, if the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse employment action. If the employer satisfies this burden of production, then, in order to prevail on her retaliation claim, the plaintiff must prove that the employer's articulated reason for the adverse action is pretextual, i.e. unworthy of belief." *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir.2001). "To raise a fact issue of pretext, a plaintiff must present evidence of temporal proximity *plus* circumstantial evidence of retaliatory motive." *E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981, 989 (10th Cir. 2012) (*emphasis* added). A "plaintiff can demonstrate pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's reasons for its action, which a reasonable fact finder could rationally find unworthy of credence." *Id.*

The legal standards for retaliation under Title VI and the NMHRA are the same as those under Title VII and § 1981. To establish retaliation under Title VI, "a plaintiff must show that: (1) she was engaging in a protected activity; (2) the funded entity subjected her to an adverse action after or contemporaneously with the protected activity; and (3) a causal link between the adverse action and the protected activity." *Whitfield v. Notre Dame Middle School*, 412 Fed.Appx. 517, 522 (3d Cir. 2011). "In order to establish a claim of retaliation under the NMHRA, a plaintiff must demonstrate that (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between these two events." *Charles v. Regents of New Mexico State University*, 256 P.3d 29, 33 (N.M.App. 2010).

**DISCUSSION**

Bird and Moraros assert retaliation claims against NMSU, Olsen and Robinson based on the following actions: (1) an audit investigation into duplicate expense reimbursement requests; (2) a memorandum containing false allegations regarding Bird and Moraros; (3) proceedings to terminate Bird and Moraros' employment; (4) false allegations of plagiarism; (5) threats to revoke Bird and Moraros' Ph.D. degrees; (6) revocation of Bird and Moraros' admission to NMSU's School of Social Work; and (7) deprived Bird and Moraros of the opportunity to teach classes.

**Expense Reimbursement Audit and Employment Termination Allegations**

Bird and Moraros assert that:

> NMSU, through Defendants Olsen and Robinson, caused an audit investigation into duplicate expense reimbursement requests to be initiated, and initiated proceedings to terminate Bird and Moraros' employment as a faculty members. The termination proceedings ultimately resulted in Bird and Moraros' termination.

(Stipulation at 1-5).

Defendants argue that the law of the case doctrine applies to Bird and Moraros' claims regarding the expense reimbursement audit and employment termination allegations. The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *McIlravy v. Kerr-McGee Coal Corp.*, 204 F.3d 1031, 1035 (10th Cir. 2000). The doctrine is "based on sound public policy that litigation should come to an end and is designed to bring about a quick resolution of disputes by preventing continued re-argument of issues already decided, " but is, however, "only a rule of practice in the courts and not a limit on their power." *Id.* The Tenth Circuit has "recognized three 'exceptionally narrow' grounds for departure from that rule of practice: (1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made

5

a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice." *Id.*; *see also Southwest Stainless, LP v. Sappington*, 582 F.3d 1176, 1184 (10th Cir. 2009) ( "Internally inconsistent findings constitute clear error.").

The Court has previously entered two orders regarding Olsen and Robinson's involvement with the expense reimbursement audit and the employment termination allegations. The Court granted summary judgment in favor of Olsen based on qualified immunity. (*See* Mem. Op. and Order at 7, Doc. 431 filed August 30, 2012). The Court concluded that Bird and Moraros did not prove the causation element on their First Amendment retaliation claims against Olsen noting that Olsen did not violate any clearly established right possessed by Bird and Moraros. (*See id.*). The Court also granted summary judgment in favor of Robinson on Bird and Moraros' race discrimination and First Amendment retaliation claims. (*See* Mem. Op. and Order, Doc. 426, filed March 23, 2012). The Court granted summary judgment on Bird and Moraros' First Amendment claims because Bird and Moraros failed to present evidence such that a jury reasonably might find that Bird and Moraros' protected speech was a substantial motivating factor in NMSU and Robinson's actions. (*See id.* at 24). The Court granted summary judgment on their race discrimination claims because Bird and Moraros did not produce evidence that NMSU and Robinson's proffered legitimate reasons for not renewing their contracts were pretextual. (*See id.* at 20).

Bird and Moraros argue that the Court that the Court should revise its previous rulings because the Court's previous rulings are "clearly erroneous and would work a manifest injustice." (Response at 19-21). Bird and Moraros' request that the Court revise its previous rulings is essentially a motion to reconsider.

Grounds warranting a motion to reconsider include (1) an intervening change in the

6

>controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice. Thus, a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law. It is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing.

*Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

The Court denies Bird's and Moraros' request to revise its previous rulings. Bird and Moraros repeat the material facts and arguments they offered previously and which the Court has already addressed. They also "draw the Court's attention to the additional evidence present in this Response," but do not explain why they did not draw the Court's attention to the additional evidence in the prior briefing. (Response at 21). The Court will apply the law of the case to Bird's and Moraros' retaliation claims against NMSU, Olsen and Robinson.

**Plagiarism Allegations**

Bird and Moraros assert a claim against NMSU stating that following their termination NMSU personnel made false allegations of plagiarism against Bird and Moraros. (*See* Stipulation at 1-5). Bird and Moraros allege that "NMSU President Michael Martin contacted Graduate School Dean Linda Lacey annd advised her that with 'modest review' he had found evidence of plagiarism in Bird's and Moraros' masters theses earned at NMSU in 2004 . . . and instructed Lacey to investigate." (Response ¶55 at 18). Bird, but not Moraros, also states that Robinson "participated in an investigation into baseless allegations that Bird plagiarized in her master's thesis." (Stipulation at 3). Neither Bird nor Moraros contend that Olsen was involved with the plagiarism allegations.

Defendants argue that the law of the case doctrine applies to Bird's and Moraros' claims against NMSU regarding the plagiarism allegations noting that the Court has granted Martin's motion for summary judgment. (*See* Mem. at 15). The Court granted Martin's motion for summary judgment based on qualified immunity after finding that Martin had "made a prima facie showing

7

that he was objectively reasonable in initiating a plagiarism investigation," and that Plaintiffs had "not produced any specific evidence that shows that Martin's motive in initiating the plagiarism investigation was to retaliate against Plaintiffs for speaking out against racial discrimination." (Mem. Op. and Order at 10, Doc. 425, filed March 6, 2012).

Bird and Moraros contend that Martin's actions and his rationale for the plagiarism investigation is pretextual and that a reasonable jury could infer that his motivation for the investigation was retaliatory. (*See* Response at 25, 35-36). As with the reimbursement audit and employment termination claims, Bird and Moraros do not provide an analysis showing that the Court's previous ruling granting summary judgment based on qualified immunity in favor of Martin is clearly erroneous. Instead, they repeat the material facts and arguments they offered previously. The Court will apply the law of the case to Bird and Moraros' retaliation claims against NMSU based on the plagiarism investigation.

The Defendants argue that the Fourth Amended Complaint makes no allegations that Robinson was involved in the plagiarism allegations and submit Robinson's affidavit which states: "At no time did I ever participate in any conversations or actions related to any investigation into potential allegations of plagiarism by Plaintiffs Bird and Moraros." (Mem. at 11 and Ex. 8 ¶ 7). Bird and Moraros state "As argued below, Plaintiffs dispute that Robinson had no involvement in the plagiarism investigation." (Response at 4). The Court has reviewed their response and did not find any material facts or any argument regarding Robinson's alleged "participat[ion] in an investigation into baseless allegations that Bird plagiarized in her master's thesis." (*See* Response ¶¶ 55-60 at 18-19, 25, 35-36). The Court grants summary judgment in favor of Robinson on Bird's claim that Robinson discriminated or retaliated against her by participating in a plagiarism investigation.

**Memorandum with False Allegations**

Bird and Moraros assert that "NMSU, through Defendants Olsen and Robinson . . . drafted a memorandum containing false allegations regarding [Bird and Moraros]." (Stipulation at 2, 4-5). Defendants do not discuss the memorandum in their motion and supporting brief. Bird and Moraros do not discuss the memorandum in their response. Because Defendants have not offered any facts or argument, they have not met their initial burden for summary judgment regarding the alleged memorandum with false allegations. *See Reed v. Bennett*, 312 F.3d 1190, 1194 (10th Cir.2002) ("Before the burden shifts to the nonmoving party to demonstrate a genuine issue, the moving party must meet its initial responsibility of demonstrating that no genuine issue of material fact exists and that it is entitled to summary judgment as a matter of law."). Consequently, the Court denies Defendants' motion for summary judgment on Bird and Moraros' retaliation claims based on the memorandum with false allegations.

**Threat to Revoke Ph.D. Degrees**

Bird and Moraros assert that "NMSU personnel . . . threatened to revoke [their] Ph.D. degree[s] granted by NMSU because NMSU claims [Bird and Moraros] had falsely represented to NMSU when [they] matriculated that [they] possessed M.D. degree[s] from a university in Mexico." (Stipulation at 2-3). They also assert that Robinson "participated in threats to revoke [Bird and Moraros'] Ph.D. degree based on the spurious claim that [they] had misrepresented the conferral of M.D. degree[s]." (Stipulation at 2-3).

Defendants do not address the alleged threats to revoke Bird and Moraros' Ph.D. degrees in their Memorandum in Support of their Motion. In their Response, Bird and Moraros mention the threats of degree revocation several times and allege that: (1) in December 2007, Olsen "responded

9

that Moraros' continued complaints would 'end up costing both of you your Ph.D. degrees;'" (2) NMSU President Martin "suggest[ed] revocation of their graduate degrees" based on evidence of plagiarism; and (3) Martin spoke to the press which reported "that there was a possibility that one or more of their NMSU degrees would be revoked." (Response at 2, 9, 18, 22-23, 25, and 36). Bird and Moraros do not allege that their degrees were revoked.

Because Defendants have not offered any facts or argument regarding the threats to revoke their degrees, they have not met their initial burden for summary judgment. Consequently, the Court denies Defendants' motion for summary judgment on Bird and Moraros' retaliation claims based on the threats to revoke their degrees.

**Rescinded Admission to NMSU's School of Social Work**

Bird and Moraros assert that "NMSU personnel . . . rescinded [their] admission to NMSU's School of Social Work, where [they] would have been able to continue [their] scholarly work." (Stipulation at 2-3). They also assert that Robinson "participated in revocation of admission of [Bird and Moraros] to NMSU's School of Social Work." (Stipulation at 2-3).

Defendants offer the following material facts regarding Bird and Moraros' rescinded admission to NMSU's School of Social Work:

> Following the termination of their [employment] contracts, Plaintiffs Bird and Moraros applied for a master program and received certificates of provisional admission in June of 2008.
>
> Dr. Bernadette Montoya, as the individual in charge of overseeing the Office of University Admissions, reports directly to the University Registrar.
>
> Prior to the Summer of 2008, the Office of University Admissions had been assigned the task of taking over graduate school admissions, pursuant to a reorganization within NMSU.
>
> As part of an audit procedure, Plaintiffs Bird and Moraros received on July 14, 2008 letters from NMSU employee Valerie Pickett of University Admission,

> indicating that there appeared to be a discrepancy as to whether there were final transcripts in their files indicating that a Doctor of Medicine degree has been awarded, and requesting a final transcript be sent from the medical school directly to the University Admissions Office.
>
> Dr. Montoya also met with Plaintiffs Bird and Moraros and indicated to them that the office did not have complete official transcripts and that they provide such to the university.
>
> On August 20, 2008, Plaintiffs Bird and Moraros received detailed written explanations as to the inconsistencies in their transcripts and were informed that NMSU would seek to meet with officials from their former school in Juarez, Mexico to verify the accuracy of Plaintiffs' transcripts.
>
> Dr. Montoya personally examined the files of Bird and Moraros and personally concluded that their files were incomplete.
>
> In response to correspondence from the University, Plaintiffs Bird and Moraros brought letters to NMSU instead of their official transcripts. The letters were not responsive to NMSU's request and thus insufficient.
>
> Plaintiffs delivered additional letters to Dr. Montoya, but they were again insufficient because they were not transcripts.
>
> NMSU proceeded to have the transcripts of Bird and Moraros analyzed by an outside service that specializes in translation of foreign academic transcripts.
>
> This was not the first time that a student had misrepresented to NMSU that they had obtained certain academic degrees.
>
> Following receipt of NMSU's letter of August 20, 2008, both Plaintiffs Bird and Moraros instructed their former medical school in Juarez to provide no further documentation to NMSU related to their medical degrees, or to make any comment whatsoever to NMSU officials, and NMSU was not to contact the school.

(Mem. ¶¶ 21-32 at 6-8).

The Defendants also argue that the Fourth Amended Complaint makes no allegations that Robinson was involved in Bird and Moraros' "inability to get permanent admission to the School of Social Work" and submit Robinson's affidavit which states: "I had no input or involvement in the university's decisions to not grant the Plaintiffs Bird and Moraros' request for admission to the

11

Masters of Social Work Program within the School of Social Work." (Mem. at 11 and Ex. 8 ¶ 6). Bird and Moraros state "As argued below, Plaintiffs dispute that Robinson had no involvement in . . . rejecting Plaintiffs for the School of Social Work Master's program." (Response at 4). The Court has reviewed their response and did not find any material facts or any argument that Robinson participated in revocation of admission of Bird and Moraros to NMSU's School of Social Work. (*See* Response ¶¶ 47-54 at 16-18, 34-35). The Court grants summary judgment in favor of Robinson on Bird's and Moraros' retaliation claim based on their rescinded admission to NMSU's School of Social Work.

> Bird and Moraros assert the following additional material facts:
>
> Following the non-renewal of their faculty contracts, Bird and Moraros applied and were granted admission to NMSU's School of Social Work, which would have permitted them to continue their research.
>
> When their applications were received, Stephen Anderson, Director of the School of Social Work, inquired of the Dean Brandon and Interim Associate Dean Vazquez whether they wanted him to refuse admission to Bird and Moraros and, if so, to put the directing in writing. If not, Anderson indicated he would process Bird and Moraros' applications according to the usual process and standards.
>
> Vazquez instructed Anderson to consult with the faculty of the School of Social Work, which he did, and the faculty agreed that he should apply the usual processes and standards to the applications. Bird and Moraros' files were reviewed, admission was recommended and Anderson signed graduate school referral forms and wrote letters of admission to Bird and Moraros.
>
> Shortly after this, on June 5, 2008 Anderson was called into Dean Brandon's office and Dean Brandon asked him to step down as director of the School of Social Work. He provided no reason for this request and stated that he was not aware of any reason stated by anyone else. He had been Director for 7 years with positive annual evaluations and two positive three-year department head reviews. Dean Brandon had never issued Anderson a reprimand of any type.
>
> In the summer of 2008 NMSU Registrar Zimmerman was asked by NMSU Provost Cruzado to evaluate Birds' and Moraros' academic credentials, specifically whether their medical degrees were awarded as they claimed. This request was unusual and was the only such request Zimmerman received from the university provost in 2006,

2007 or 2008. Bernadette Montoya testified that it was a "random" audit.

NMSU then contacted Bird and Moraros asking for additional records verifying their medical diplomas from UACJ, under the pretense of a "random audit". Bird and Moraros cooperated with NMSU and provided access to all records NMSU sought, including official letters from UACJ verifying their 2002 graduation and the award of medical diplomas to them and documentation that UACJ had provided official transcripts to NMSU in 2002.

In the summer of 2008, the Autonomous University of the City of Juarez ("UACJ"), the university that conferred medical degrees on Bird and Moraros, issued official letters to NMSU, at the request of Bird and Moraros, confirming that Bird and Moraros graduated and were awarded medical doctorate diplomas in June 2002 and that it had provided an official transcript to NMSU in 2002 diplomas to them and documentation that UACJ had provided official transcripts to NMSU in 2002.

NMSU refused to accept this documentation and rescinded their admissions into the School of Social Work.

(Response ¶¶ 47-54 at 16-18).

Bird and Moraros argue that the rationale for revocation of their admission to the School of Social Work is pretextual. (*See* Response at 34-35). Bird and Moraros contend that:

1.   A reasonable jury could find that Anderson's removal without notice, in the face of positive performance evaluations and just a few weeks after Bird and Moraros filed EEOC charges challenging their removal, was because he approved Bird and Moraros' admission to the School of Social Work;

2   A reasonable jury could further find that the audit singled them out because of their recent EEOC charges and formed a convenient pretext to rescind their admission to the School of Social Work; and,

3.   A reasonable jury could find that evidence that was acceptable to NMSU in 2002 and 2004, but suddenly unacceptable in 2008, was deemed unacceptable for an illegitimate reason, because Bird and Moraros had complained of discrimination.

(Response at 34-35). The Court disagrees that Bird and Moraros have demonstrated that NMSU's rationale for revoking their admission to the School of Social Work is pretextual.

Bird and Moraros contend that a jury could find that Anderson's removal was because he approved their admission to the School of Social Work but have not explained why this is relevant

13

to the revocation of their admissions.

Bird and Moraros contend that a jury could find that the "audit singled them out because of their recent EEOC charges." Bird and Moraros mischaracterize the record. The undisputed record evidence shows that: (1) prior to the summer of 2008 and pursuant to a reorganization, NMSU assigned the Office of University Admissions, whose only responsibility prior to the reorganization was undergraduate admissions, to take over graduate admissions; (2) after recognizing there were some problems, the Office of University Admissions determined it needed to run an audit of the admissions files as they had done a couple of years earlier with the undergraduate admissions; (3) the Office of University Admissions audited all graduate files for 2008; (4) letters regarding file deficiencies were sent to other students besides Bird and Moraros. (*See* Deposition of Bernadette Montoya at 14:11-18:8, Doc. 456-7 at 5-6, filed February 22, 2013). Bird and Moraros' have not cited to any portions of the record to support their contention that they were "singled out."

Bird and Moraros contend that a reasonable jury could find that evidence that was acceptable to NMSU in 2002 and 2004, but suddenly unacceptable in 2008, was deemed unacceptable for an illegitimate reason, because Bird and Moraros had complained of discrimination. Whether their files were "acceptable" in 2002 and 2004 is irrelevant. Bird and Moraros' files may, as they contend, have contained their final transcripts from UACJ in 2002 and 2004. However, in 2008, when the Office of University Admissions took over graduate admission and conducted an audit, Bird's and Moraros' files did not contain final transcripts from UACJ. The Office of University Admissions requested final transcripts. Bird and Moraros supplied circumstantial evidence that they provided their final transcripts in 2002 but did not have UACJ provide final transcripts and instead asked UACJ to provide NMSU with no further information regarding their academic studies at UACJ.

NMSU has provided a legitimate reason for rescinding Bird's and Moraros' admission to the

14

School of Social Work. NMSU indicated, and Bird and Moraros do not dispute, that it requires a final transcript verifying completion of previous degrees for admission into the graduate school. NMSU also indicated that an audit showed that NSMU did not have a final transcript for Bird. NMSU requested final transcripts from Bird and Moraros. After Bird and Moraros refused to provide final transcripts NMSU rescinded their admissions to the School of Social Work. Bird and Moraros contend that NMSU's reason for rescinding their admissions is pretextual because they provided their final transcripts in 2002. Even if NMSU had their final transcripts in 2002 and 2004, the record evidence shows that NMSU did not have their final transcripts in 2008 when Bird and Moraros applied to the graduate program in NMSU's School of Social Work. The record evidence also shows that Bird and Moraros did not provide their final transcripts after NMSU requested the final transcripts and indicated that the final transcripts were required for admission to the graduate program. Bird and Moraros have not shown weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in NMSU's reason for rescinding their admissions, which a reasonable fact finder could rationally find unworthy of credence. The Court grants summary judgment in favor of NMSU on Bird's and Moraros' retaliation claims based on the revocation of their admission to the School of Social Work.

**Deprived of Opportunity to Teach Classes**

Bird and Moraros assert that Olsen and Robinson retaliated against them by participating in depriving Bird and Moraros of the opportunity to teach classes they had been promised. (*See* Stipulation at 2, 5).

Defendants refer to two instances where Bird and Moraros allegedly were not allowed to teach classes: (1) during the summer of 2007; and (2) during the spring of 2008. (*See* Mem. ¶¶ 6(a) and 7, at 3, ¶ 11 at 4, at 13). Defendants offer the following material facts regarding the alleged

deprivation of the opportunity to teach classes during the summer 2007:

> Due to lack of enrollment, the summer class in 2007, to have been taught by John Moraros, was canceled. The summer class to have been taught by Yelena Bird had significant enrollment. The resolution was splitting of Yelena Bird's class into two sections, with John Moraros teaching one and Yelena Bird teaching the second with no reduction in compensation.

(Mem. ¶¶ 11-12, 14 at 4-5). Defendants argue that Bird and Moraros cannot demonstrate a prima facie case of retaliation because Bird and Moraros have not established that they engaged in protected activities prior to the alleged cancellation of the classes. (*See* Reply at 1, 3).

Defendants also state that Bird and Moraros "claim they were not allowed to teach graduate study classes in the Spring of 2008." (Mem. ¶ 6 at 3). Defendants do not offer any material facts regarding Robinson's involvement with the alleged deprivation of the opportunity to teach classes. Instead, they refer to the Court's previous Memorandum Opinion and Order in which the Court found that Robinson's only knowledge of Bird and Moraros' protected speech was their August 2007 memorandum "implicating Robinson and Olsen in serious wrongdoing." (*See* Doc. 426 at 23-24, filed March 23, 2012). Defendants argue that "there is no knowledge of protected activity in proximity to the January request to teach Master's Thesis courses that would demonstrate that any decision not to allow them to teach was, in fact, an act of retaliation." (Mem. at 10). Defendants also argue that "there is no evidence that either Bird or Moraros were qualified as part of the graduate faculty, nor is there evidence in the record that they had a graduate student requesting that Plaintiff serve as their instructor." (Mem. at 10). Defendants further argue that as "demonstrated by Dr. Robinson's testimony and the fact that the Plaintiffs were not already on the graduate faculty, a non-pretextual reason has been offered that has been [sic] not been disputed by Plaintiffs." (Mem. at 10). In his affidavit, Robinson states that "At the time I was hired in the Summer of 2007, the Fall class schedule for 2007 and the Spring class schedule for 2008 had already been arranged by the

16

then acting Department Head, and that would include prospectively which faculty would teach Master's Thesis Research classes." (Mem. Ex. 8 ¶ 2).

Bird and Moraros do not dispute the facts offered by Defendants. Although they state in their response that they dispute paragraph 11, which states "Due to lack of enrollment, the summer class in 2007, to have been taught by John Moraros, was canceled," their purported reason for disputing paragraph 11 appears to be an editorial comment from an earlier draft of their response which asks: "Do we agree that the Moraros class was cancelled due to lack of enrollment?" (Response at 1-2). Bird and Moraros do not make any argument regarding the allegation that Olsen and Robinson deprived them of the opportunity to teach the classes referred to in Defendants' material facts. The only discussion in their Response is the following material fact based on statements in Moraros' Declaration, (Doc. 52-1 at 4-5), which alleges that there were *two* classes that Moraros was scheduled to teach but which were cancelled:

> In May 2007 Moraros complained to Olsen about the sexually explicit and offensive nature of one of his emails. That same month Olsen informed Moraros that two classes he was scheduled to teach that summer were cancelled, allegedly due to low enrollment. One of the classes actually had sufficient enrollment. Olsen failed to follow NMSU policy because he did not consult with then-Department Chair Stephen Anderson about the course cancellation. When Moraros complained to Olsen he indicated that "that's what happens to people with no sense of humor." Eventually Moraros was allowed to teach one summer course.

(Response ¶ 12 at 6).

The Court grants summary judgment in favor of Defendants on Bird and Moraros' retaliation claims based on the alleged deprivation of opportunity to teach classes in large part. Defendants indicate, and Bird and Moraros do not dispute, that Defendants did not cancel a class that was taught by Bird in the summer of 2007. Defendants assert, and Bird and Moraros do not dispute, that while they did cancel one class that Moraros was to teach in the summer of 2007 due to low enrollment,

17

the Defendants allowed Moraros to teach another class with no reduction in compensation. Regarding the alleged deprivation of the opportunity to teach classes in the spring of 2008, Defendants assert, and Bird and Moraros do not dispute, that the teachers for the spring 2008 classes had already been assigned and that there is no evidence that Bird and Moraros were qualified as part of the graduate faculty to teach those classes.  The Court denies Defendants' motion for summary judgment on Moraros' retaliation claim based on the alleged cancellation of the second class Moraros was supposed to teach during the summer of 2007 because Defendants have not met their initial burden by offering any facts or argument regarding the second class.

    **SO ORDERED.**

                                            **UNITED STATES DISTRICT JUDGE**